[Civ. No. 21797. First Dist., Div. One. July 7, 1965.]

M. B. RICH, Plaintiff and Respondent, v. STATE BOARD OF OPTOMETRY et al., Defendants and Appellants.

[Civ. No. 21961. First Dist., Div. One. July 7, 1965.]

ALONZO W. OAKLEY, JR., et al., Plaintiffs and Respondents, v. ARTHUR B. EMMES et al., Defendants and Appellants.

(Consolidated Appeals.)

592

594

Stanley Mosk and Thomas C. Lynch, Attorneys General, and Wiley W. Manuel, Deputy Attorney General, for Defendants and Appellants.

Wilke, Fleury & Sapunor and Joe S. Gray as Amici Curiae on behalf of Defendants and Appellants.

Jefferson E. Peyser, J. Edward Fleishell and Wainwright & Fleishell for Plaintiffs and Respondents.

Charles J. Katz and Louis C. Hoyt as Amici Curiae on behalf of Plaintiffs and Respondents.

MOLINARI, J.—These two separate cases present a major common issue and will therefore be considered together. In

each the State Board of Optometry and its members[1] appeal from the judgment commanding the Board to issue a branch office license to petitioners therein.[2]

### Procedural Background

All three petitioners are optometrists duly licensed by the State of California. Prior to October 1, 1959 Oakley and Layne, whose principal office for the practice of optometry was located in Oakland, maintained a number of branch offices and held branch office licenses issued by the Board authorizing them to practice optometry at each of these branch office locations. Similarly, Rich, who maintained his principal place of business in San Francisco, operated 10 branch offices and possessed a corresponding number of branch office licenses.

On February 26, 1962 Oakley and Layne filed with the Board an application for a license for a branch office at 238 Hillsdale Mall, Hillsdale Shopping Center, San Mateo. The purpose of the filing of this application was to transfer to the Hillsdale Shopping Center their branch office which was located at 205 East Fourth Avenue in San Mateo. On January 25, 1963 Rich filed with the Board an application for transfer of his branch office license from 4 Geary Street in San Francisco to new premises located at 246-248 Powell Street, San Francisco. Upon a statement of issues filed by the Board praying that a hearing be held thereon and that the respective applications be denied, hearings were had before a hearing officer of the Office of Administrative Procedure. The hearing officer in each case recommended that the applications be denied and the respective decisions of the hearing officer were adopted as the decision of the Board.

On December 4, 1962, and June 12, 1963, respectively, Oakley and Layne and Rich filed their respective petitions for issuance of peremptory writs of mandate. To the alternative writ of mandate which was issued in the Oakley and Layne case, the Board filed a return by way of demurrer in addition to its return by way of answer. The demurrer, which was

---

[1]Appellants, who were respondents in the proceedings below, are the State Board of Optometry and its members. Except for J. R. Patterson, who was named as a party in the *Rich* case but not in the *Oakley* and *Layne* case, the Board members made a party to both actions are the same individuals. Hereafter we use the term ''the Board'' as referring to the State Board of Optometry and its members as well.

[2]In No. 21797 petitioner and respondent is Dr. M. B. Rich; in No. 21961, petitioners and respondents are Drs. Alonzo W. Oakley and R. M. Layne. Hereafter we shall refer to the respective respondents either individually by surname or collectively as ''petitioners.''

based on the timeliness of the proceedings, was overruled by the trial court. When the alternative writs came on for hearing before the superior court, the respective matters were, by stipulation of the parties, submitted upon the record of the proceedings before the Board. The trial court subsequently entered its respective judgments granting the peremptory writs of mandate, and also ordering that the appeal of the judgments would not act as a stay of execution in either case.

## The Issue

The crux of this litigation involves the meaning and effect of a statutory change made to section 3077 of the Business and Professions Code[3] in 1959. Section 3077, which was enacted in 1955, set up the requirement that after January 1, 1957, an optometrist must obtain a branch office license from the Board for each branch office which he operated. (§ 3077, subd. (f).) The statute as originally enacted, however, contained no restriction on the number of branch offices or branch office licenses available to an optometrist.[4] Accordingly, although from 1957 the Board took the position that branch office licenses were not transferable and made this position clearly known to its licentiates,[5] it was possible for an optometrist to relocate his branch office simply by surrendering the license which he possessed for the branch office to be relocated and making proper application for a new license to be issued at the new location. (See 34 Ops. Cal. Atty. Gen. 278.)

In 1959, section 3077 was amended so as to restrict the number of branch offices available to an optometrist by providing that ''On or after October 1, 1959, no more than one branch office license shall be issued to any optometrist or to any two or more optometrists, jointly.'' (§ 3077, subd. (f).)[6]

---

[3]Unless otherwise indicated, all statutory references are to the Business and Professions Code.

[4]Subd. (i) of this section read at that time as follows: ''Nothing in this chapter shall limit, or authorize the board to limit, the number of branch offices which may be opened or operated by any optometrist or by any two or more optometrists, jointly, whose operations conform to the provisions of this chapter.''

[5]The position of the Board in this respect was contained in the branch office licenses issued to petitioners and in the annual branch office license renewal notices sent out to optometrists possessing branch office licenses.

[6]Subd. (c) of § 3077, was also amended to read as follows: ''On and after October 1, 1959, no optometrist, and no two or more optometrists jointly, may have more than one office unless he or they comply with the provisions of this chapter as to an additional office. Such additional office, for the purposes of this chapter, constitutes a branch office.''

A so-called "grandfather clause" was, however, incorporated into subdivision (i) so as to make said subdivision read, in its entirety, as follows: "Nothing in this chapter shall limit or authorize the board to limit the number of branch offices which are in operation on October 1, 1959 and which conform to the provisions of this chapter, nor prevent an optometrist from acquiring any branch office or offices of his parent. The sale after October 1, 1959 of any branch office shall terminate the privilege of operating such branch office and no new branch office license shall be issued in place of the license issued for such branch office, unless the branch office is the only one operated by the optometrist or two or more optometrists jointly. Nothing in this chapter shall prevent an optometrist from owning, maintaining or operating more than one branch office if he is in personal attendance at each of his offices fifty percent (50%) of the time during which such office is open for the practice of optometry." (§ 3077, subd. (i).)

In the light of the 1959 statutory changes, the major issue presented is whether petitioners are entitled to relocate the branch offices which are the subject of their respective applications. While both the Board and petitioners state the issue in terms of the right of petitioners to *transfer* their respective branch office licenses from one branch office to another, we are of the opinion that the basic problem is made more understandable, and that a solution is more easily reached, if the issue is phrased in the language of subdivision (i) of section 3077, that is, in terms of whether the Board has the authority to prevent petitioners from relocating their branch offices and continuing to operate such relocated branch offices. If, on the one hand, we conclude that it has no such authority, then it follows that petitioners are entitled to branch office licenses for their relocated branch offices and that the Board must provide a means by which petitioners can obtain valid and effective branch office licenses—either by allowing petitioners to transfer their present licenses or by issuing new branch office licenses to them. On the other hand, if we conclude that petitioners, by relocating their branch offices, have lost the protection of subdivision (i) of section 3077, then it would follow that under the remaining provisions of this statute, petitioners would not be entitled to maintain their relocated branch offices, nor, of course, would they be entitled either to obtain new branch office licenses or to achieve the transfer of their existing licenses. By reframing

the issue in this manner, we put the emphasis on that aspect of the conflict which concerns the basic right of petitioners to relocate their branch offices, rather than on the procedural aspect of how this right, if it exists, is to be achieved. Such an approach to the problem does not in any way result in an alteration of the basic issues which these appeals present. On the other hand, it does eliminate the necessity of our confronting the issue of whether, in view of the apparent absence of a statutory provision authorizing the transfer of branch office licenses, the transferability of a license is an incident of licensure only where it is made so by statute, and the corollary issue of whether the Board's regulations prohibiting the transfer of a branch office license (which regulations have existed since 1955) conflict with the provisions of section 3077 or are in any way unconstitutional in and of themselves.

## The Administrative Hearings

At each of the administrative hearings documentary and testimonial evidence was presented. Such evidence related in part to the legislative history of the amended section 3077. Assemblyman Don Mulford was called as a witness at the Oakley and Layne hearing to testify concerning certain language which was contained in the "grandfather clause" portion of the originally introduced bill amending section 3077. This language read as follows: "The *sale, removal, or abandonment* after October 1, 1959 of any branch office shall terminate the privilege of operating such branch office. . . ." (Italics added.) Mulford testified, over objection on the ground of incompetency,[7] as follows: That while the bill was in committee, it was called to his attention by Layne that the language contained in the proposed amendment to section 3077 would "put optometrists out of business"; that the committeemen then began conjuring up situations under which the destruction or elimination of an optometrist's branch office might result, for example, by fire, condemnation, and rental problems; that the committee then unanimously agreed that they did not intend this legislation to have the effect of putting such persons out of business; and that accordingly the amendment deleting the words "removal, or abandonment" was proposed and unanimously adopted. Similar, although less detailed, statements were introduced at the Rich hearing in the form of affidavits of Mulford and

---

[7] A motion to strike the Mulford testimony on the ground of incompetency was also made and denied.

Senator Teale. These were objected to on the ground of hearsay but the objection was overruled.

There was also introduced at both administrative hearings an opinion of the Attorney General on the subject of the transferability of a branch office license. This opinion, which was written in 1959 following the enactment of the amendments to section 3077, contains the following conclusionary statement: "Branch office licenses issued to registered optometrists are not transferable to a new location. Relocation of a branch office can be accomplished only by surrender of the old license, making proper application for a new branch office license to be issued to the new location, and satisfying the State Board of Optometry that issuance of the new branch office license will not violate the present terms of the act limiting the number of branch offices available to optometrists." (34 Ops. Cal. Atty. Gen. 278.)

The records of these administrative hearings disclose that based on this opinion of the Attorney General, the Board, subsequent to the enactment of the 1959 amendments to section 3077, persisted in its position that branch office licenses were not transferable. Notwithstanding this apparent "established policy," however, the Rich administrative hearing contains the testimony of an executive officer of the Board to the effect that in 1961 the Board granted Rich's request to transfer his branch office license for 2512 Mission Street to 2520 Mission Street (or more accurately, it issued a new license to him), this transfer having been requested because of a substantial increase in rent at Rich's original Mission Street address. Furthermore, this same witness testified that, although it eventually became unnecessary, the Board was prepared to grant another request to transfer a branch office license because the licensee had lost his lease at his original location.

The following additional facts relating specifically to petitioners were adduced at these hearings: It was stipulated between the respective parties that except as to the present controversy relating to section 3077 and the relocation of branch offices, petitioners have complied with all of the rules and regulations of the Board and with all of the laws relating to the practice of optometry. At the respective hearings, Rich testified that he spent approximately one day every two weeks at each of his branch offices, and Layne testified that he spent three-fourths of his time at the main office in Oakland, and that Oakley spent most of his time at the other

Oakland office.[8] With respect to the reasons for the desired relocation of the Oakley and Layne branch office, Layne testified that the San Mateo branch office which he and Oakley operated prior to October 1, 1959 was losing money and thus had become economically unfeasible, and also that he and Oakley had been informed by their San Mateo landlord that they were unsuitable tenants and would have to move. The reason for Rich's move is, as indicated on the application for the issuance of a branch office license which he filed with the Board, "that new optometric techniques and changing and improved optometric practice require adequate space and facilities in order to afford proper professional care, and the new premises will make this possible."

### Timeliness of Oakley and Layne Petition

The Board urges that Oakley and Layne did not seek judicial review of its decision within the 30-day period prescribed by Government Code section 11523.[9] The record discloses that the Board's decision was made on October 8, to become effective on the same date. Accordingly, pursuant to the provisions of Government Code sections 11521 and 11523, judicial review under the Administrative Procedure Act expired on November 7, 1962. The petition in the present case was not filed until December 4, 1962, however.

The contention of the Board, which was rejected by the court below, is that court review of its action must necessarily be based on section 1094.5 of the Code of Civil Procedure [10] relating to inquiry by mandamus into the validity of an administrative order or decision, and that, therefore, the instant petition was barred when it was filed more than

---

[8]Based on this testimony it is apparent that none of petitioners spent 50 per cent of his time at any of the branch offices sought to be relocated so as to bring into play the provisions of subd. (i) of § 3077 permitting an optometrist to own, maintain or operate more than one branch office if he is in personal attendance at each of his offices 50 per cent of the time during which such office is open for the practice of optometry.

[9]Gov. Code, § 11523, in relevant part, provides as follows: "Judicial review may be had by filing a petition for a writ of mandate in accordance with the provisions of the Code of Civil Procedure. Except as otherwise provided in this section any such petition shall be filed within 30 days after the last day on which reconsideration can be ordered." Gov. Code, § 11521, in pertinent part, provides that "The power to order a reconsideration shall expire 30 days after the delivery or mailing of a decision to respondent, or on the date set by the agency itself as the effective date of the decision if such date occurs prior to the expiration of the 30-day period. . . ."

[10]Code Civ. Proc., § 1094.5, in relevant part, provides as follows: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result

30 days after the time provided in Government Code section 11523. Oakley and Layne concede that they have not proceeded pursuant to Code of Civil Procedure section 1094.5, but assert that they were not required to do so and could proceed, as they did, pursuant to Code of Civil Procedure section 1085, which is controlled not by the 30-day limitation prescribed by Government Code section 11523, but instead by the 4-year period of limitations provided for in Code of Civil Procedure section 343. (*Allen* v. *Humboldt County Board of Supervisors*, 220 Cal.App.2d 877, 884-885 [34 Cal.Rptr. 232].)

■ Turning to the merit of the Board's contention, we note initially that Code of Civil Procedure section 1094.5 is only applicable when the conditions set forth in subdivision (a) of that section are present. These conditions are that the order or decision sought to be reviewed must be the result of a proceeding in which (1) by law a hearing is required to be given; (2) evidence is required to be taken; and (3) the determination of the facts is vested in the inferior tribunal, corporation, board or officer. (*Keeler* v. *Superior Court*, 46 Cal.2d 596, 599 [297 P.2d 967]; see Judicial Council Tenth Biennial Report, dated December 31, 1944.) As stated in *Temescal Water Co.* v. *Department of Public Works*, 44 Cal. 2d 90, 101 [280 P.2d 1], "The decisive question is whether the agency exercises an adjudicatory function in considering facts presented in an administrative hearing." Accordingly, it has been held that section 1094.5 is applicable only in situations where an administrative agency has been called upon to make some factual determination within its quasi-judicial function; where, on the other hand, the action of the agency is quasi-legislative or merely ministerial, this statute does not apply. (*Temescal Water Co.* v. *Department of Public Works, supra*, pp. 99-101; *Brock* v. *Superior Court*, 109 Cal.App.2d 594, 598-601 [241 P.2d 283]; *Munns* v. *Stenman*, 152 Cal.App.2d 543, 556 [314 P.2d 67].) ■ It is apparent, therefore, that section 1094.5 of the Code of Civil Procedure does not embrace all attacks upon administrative action and that the adoption of this section was neither intended to nor does in fact change the historic use of the writ of mandate, except as to those cases which come specifically under its provisions. (See Judicial Council Tenth Bi-

of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer, the case shall be heard by the court sitting without a jury."

ennial Report, *supra*; *Allen* v. *Humboldt County Board of Supervisors, supra,* p. 882.)

In the instant case, whether we consider the Board's action in refusing to allow Oakley and Layne to relocate their branch office as quasi-legislative in the sense that the Board was adopting a regulation to carry out the provisions of section 3077, pursuant to its power under subdivision (j) of this section,[11] or whether, on the other hand, we consider that the issuance of a branch office license for a new location was a mere ministerial action compelled by section 3077, it is clear that the Board was not called upon to make a factual determination within its quasi-judicial function, but rather to decide a question of law. In such a situation no hearing is required either by statute or by the Board's own rules. The fact that a hearing was in fact held does not make applicable the otherwise inapplicable section 1094.5 of the Code of Civil Procedure. Furthermore, the evidence taken by the Board in the instant case was considered by it for the purpose of deciding a question of law rather than of fact, this evidence having been admitted solely for the purpose of throwing light on the legislative intent as to the enactment of the 1959 amendments to section 3077 and on the interpretation of these amendments adopted by the Board itself. Whether or not this proceeding before the Board did in fact constitute a hearing is not important as the requirement under section 1094.5 of the Code of Civil Procedure is that a hearing with the taking of evidence be required, not that one be held. (*Keeler* v. *Superior Court, supra,* p. 599.) We conclude, therefore, that Oakley and Layne, in seeking judicial relief, had a right to do so under the provisions of Code of Civil Procedure section 1085, relating to the issuance of the "traditional writ," and, accordingly, that in bringing these proceedings, they are not bound by the time limits prescribed by the Government Code.

### *Mulford's Testimony*

It is claimed by the Board that as regards the Oakley and Layne administrative hearing, it was error for the hearing officer to admit Mulford's testimony over its objection on the ground of incompetency. It should be noted here that no claim of error is made in the Board's briefs in the Rich appeal with respect to the admissibility of Mulford's

---

[11]Section 3077, subd. (j), provides as follows: "The board shall have the power to adopt, amend, and repeal rules and regulations to carry out the provisions of this section."

testimony and that of Senator Teale in the Rich hearing.

A reviewing court may assume that an appellant has abandoned an assertion of error urged in the court below but not argued in the briefs on appeal. (*Blackman* v. *Kristovich*, 216 Cal.App.2d 792, 795 [31 Cal.Rptr. 413]; *People* v. *Scott*, 24 Cal.2d 774, 783 [151 P.2d 517].)

As we have hereinabove pointed out, no administrative hearing was necessary in the instant matter. Therefore, the question of whether Mulford's testimony was admissible in the hearing is of no moment. However, in view of the stipulation of the parties that the records made before the Board are to be considered as the records in the mandate proceedings in the court below, we shall treat Mulford's testimony as if it were before the trial court and as if the objection made before the hearing officer had been made to the trial judge and overruled by him.

It is established that in interpreting a statute a court may properly rely on extrinsic aids such as the history of the statute, committee reports, the legislative debates, and statements to the voters on initiative and referendum measures. (*People* v. *Knowles*, 35 Cal.2d 175, 182 [217 P.2d 1].) However, the testimony of an individual legislator as to his intention, or motive, or opinion with regard to a particular piece of legislation is inadmissible. (*In re Lavine*, 2 Cal.2d 324, 327 [41 P.2d 161, 42 P.2d 311]; *Boie-Hansen* v. *Sisters of Charity*, 152 Cal.App.2d 845, 848 [314 P.2d 189]; *Ex Parte Goodrich*, 160 Cal. 410, 417 [117 P. 451, Ann.Cas. 1913A 56].) In the light of these principles we are satisfied that Mulford's testimony was not an expression of his own opinion as to the meaning of the statute, or of his own intention or motives with respect thereto, but a reiteration of the discussion and events which transpired in the Assembly committee hearing when the amendments to section 3077 were under consideration. In other words, Mulford's testimony, consisting as it does of the committee's discussion leading up to its adoption of the proposed amendments with the deletions hereinabove discussed, amounts to a report of the committee's activity with respect to this bill, and is certainly part of the legislative history of section 3077. As such, the committee's consideration of the proposed amendments and its action with respect thereto throw some light on the purpose which the Legislature sought to express by the words of the amendments it ultimately adopted. Accordingly, no error was committed in admitting Mulford's testimony.

604

## Applicable Principles

The construction of a statute and its applicability to a given situation are matters of law. (*Estate of Madison,* 26 Cal.2d 453, 456 [159 P.2d 630]; *Neal* v. *State of California,* 55 Cal.2d 11, 17 [9 Cal.Rptr. 607, 357 P.2d 839]; Code Civ. Proc., § 2102.) Accordingly, where an administrative agency's determination involves the construction of a statute, its interpretation is a question of law which is reviewable by the courts. (*Bila* v. *Young,* 20 Cal.2d 865, 867 [129 P.2d 364]; *Estate of Madison, supra,* p. 456; *Bodinson Mfg. Co.* v. *California Emp. Com.,* 17 Cal.2d 321, 325-326 [109 P.2d 935].) It is the rule, however, that the administrative interpretation of a statute will be accorded great respect by the courts and will be followed if not clearly erroneous. (*Bodinson Mfg. Co.* v. *California Emp. Com., supra,* p. 325; *People* v. *Southern Pac. Co.,* 209 Cal. 578, 594 [290 P. 25]; *Cohon* v. *Department of Alcoholic Bev. Control,* 218 Cal.App.2d 332, 339 [32 Cal.Rptr. 723].)

When called upon to ascertain the intent of the Legislature the court should ascertain such intent so as to effectuate the purpose to be achieved and avoid the evils to be eliminated. (*Select Base Materials, Inc.* v. *Board of Equalization,* 51 Cal.2d 640, 645 [335 P.2d 672]; *Benson* v. *Superior Court,* 214 Cal.App.2d 551, 558 [29 Cal.Rptr. 760]; *Lesem* v. *Board of Retirement,* 183 Cal.App.2d 289, 298 [6 Cal.Rptr. 608].) An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them. (*Chavez* v. *Sargent,* 52 Cal.2d 162, 203 [339 P.2d 801]; *Benson* v. *Superior Court, supra,* p. 558.) While a court may also properly rely on extrinsic aids in ascertaining the intention articulated in a statute, the court should first turn to the words of the statute to determine the will of the Legislature. (*People* v. *Knowles, supra,* p. 182.) A court should not, moreover, add to or alter the words of the statute to accomplish a purpose that does not appear on the face of the statute or from its legislative history if the words of the statute are clear; nor should the court seek hidden meanings not suggested by the statute or by the available extrinsic aids. (*People* v. *Knowles, supra,* p. 183; *In re Miller,* 31 Cal.2d 191, 198-199 [187 P.2d 722].)

## The "Grandfather Clause" of Section 3077

As the Board correctly points out, the 1959 amend-

ments to section 3077 were apparently added for the purpose of making the practice of optometry less commercial and more professional, "to insure an adequate measure of personal performance and supervision in keeping with the nature of the service and the avoidance of the evils of competition which has its place in trade and mercantile pursuits but not in the practice of this profession." (*Abelson's Inc.* v. *New Jersey State Board of Optometrists,* 5 N.J. 412 [75 A.2d 867, 871, 22 A.L.R.2d 929, 936].) That this was the purpose of the statute was also testified to by Mulford. To achieve this aim, the amended statute limits the number of branch office licenses which an optometrist may possess, and, correspondingly, branch offices which he may operate to one, allowing him to maintain additional branch offices "if he is in personal attendance at each of his offices fifty percent (50%) of the time during which such office is open for the practice of optometry."

The statute, as amended, does however contain a "grandfather clause" aimed at exempting from its coverage certain optometrists who, prior to the enactment of the amendments, had already established a greater number of branch offices than would be allowable under the amended version of the statute. The purpose of such a "grandfather clause" is stated in the case of *Golden Gate Scenic Steamship Lines, Inc.* v. *Public Utilities Com.,* 57 Cal.2d 373, 379 [19 Cal.Rptr. 657, 369 P.2d 257], as follows: "The purpose of a grandfather clause is to give those engaged in a business being brought under regulation the right to continue their existing business without being subjected to certification requirements that would be applicable if the business were then being started for the first time. [Citations.]" Focusing on the structure of the "grandfather clause" contained in section 3077, we note that subdivision (i) is comprised of two parts. It first provides that "Nothing in this chapter shall limit or authorize the board to limit the number of branch offices which are in operation on October 1, 1959 and which conform to the provisions of this chapter. . . ." In regard to this language, the Board contends that this clause protects only the particular branch offices which were actually in operation on October 1, 1959. ■■■ The subject clause does not, however, make any reference to the location at which the branch offices were located on October 1, 1959, but, merely, prohibits the Board from limiting the "*number* of branch offices which were in operation on October 1, 1959. . . ." (Italics added.)

It is clear, therefore, that under the provisions of this clause an optometrist is entitled to continue to operate, after the passage of the amendments to section 3077, the same number of branches which he operated on October 1, 1959.

The Board urges, moreover, that an optometrist cannot move a branch office from the location it occupied on October 1, 1959 to another location. The second part of subdivision (i) furnishes us with the answer to this contention. It provides that "The sale after October 1, 1959 of any branch office shall terminate the privilege of operating such branch office and no new branch office license shall be issued in place of the license issued for such branch office, unless the branch office is the only one operated by the optometrist or two or more optometrists jointly." "A sale is a contract by which, for a consideration, one transfers to another property or an interest therein." (*Yick Sung* v. *Herman*, 2 Cal.App. 633, 635 [83 P. 1089]; *Giffen* v. *Selma Fruit Co.*, 5 Cal.App. 50, 53 [89 P. 855].) This definition coincides with the common law definition of sale (see "Sale," Black's Law Dict., 4th ed.), and is substantially the same as used in Commercial Code section 2106, and in other statutes in this state. (See, e.g., Rev. & Tax. Code, § 6006, subd. (a); Bus. & Prof. Code, § 7026.5; Corp. Code, § 25009.) It is apparent from these definitions that in order to constitute a sale the contract must give and pass rights of property, and that a mere transfer of the location of a business does not involve a transfer of ownership or of title to that business, or, in fact, to any property.

This provision providing for the loss of the privilege of operating a branch office upon the sale of the business operated at such branch office location is a strong indication that the Legislature considered the question of the circumstances under which an optometrist who operated a branch office on October 1, 1959 might lose that privilege. It is likewise apparent from the language of the subject clause and the legal definition of a "sale," that it was the legislative intent that excepting, of course, for the causes warranting suspension or revocation of the optometrist's certificate of registration (see §§ 3090 to 3108, inclusive and see § 3077, subd. (g)), the privilege of operating a branch office which was in operation on October 1, 1959 could only be lost upon the sale of the business operated at such branch location. This conclusion is impelled not only by the fundamental rules of statutory construction which require that words be

given their ordinary and usual meaning, unless otherwise clearly intended or indicated (*Estate of Richartz*, 45 Cal.2d 292, 294 [288 P.2d 857]; *Whitley* v. *Superior Court,* 18 Cal.2d 75, 78 [113 P.2d 449]; *Select Base Materials, Inc.* v. *Board of Equalization, supra,* 51 Cal.2d 640, 645), and that effect be given to all parts of a statute (*Select Base Materials, Inc.* v. *Board of Equalization, supra,* p. 645; *Shelby* v. *Southern Pac. Co.,* 68 Cal.App.2d 594, 599 [157 P.2d 442]), but also by the rule that the expression of one thing in a statute necessarily excludes other things not mentioned. (*Shelby* v. *Southern Pac. Co., supra,* p. 599; *Collins* v. *City & County of San Francisco,* 112 Cal.App.2d 719, 731 [247 P.2d 362]; Code Civ. Proc., § 1858.) Accordingly, in spite of the policy considerations involved in the instant case, we are of the opinion that subdivision (i) of section 3077, as properly construed, affords protection to optometrists operating branch offices on October 1, 1959 and that, in the absence of the sale of the business operated at a branch office location, optometrists are entitled to continue to maintain and operate as many branch offices as they operated on October 1, 1959.

The conclusion herein reached by us is fortified by the legislative history of section 3077. In ascertaining the intent of the Legislature we find of significance the fact that the phrase "removal, or abandonment," which followed the word "sale" in the amendment to subdivision (i) as originally introduced in the Legislature, was deleted from the final form of the statute as enacted.

The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provision. (*Gilbertson* v. *McLean,* 216 Ore. 629 [341 P.2d 139, 145]; *State Board of Barber Examiners* v. *Walker,* 67 Ariz. 156 [192 P.2d 723, 728]; *Pennsylvania R.R. Co.* v. *International Coal Mining Co.,* 230 U.S. 184, 198-199 [33 S.Ct. 893, 57 L.Ed. 1446, Ann. Cas. 1915A 315].) The legislative debate involving such deletion, as testified to by Mulford and Teale, is likewise indicative of the Legislature's intent that the number of branch offices in operation on October 1, 1959 would not be diminished except where a branch office was sold. Had the words "removal, or abandonment" been ultimately included in the statute, we have no doubt that an optometrist who transferred his branch office from one location to another subsequent to 1959 would have been deemed to have "removed" his office, would

consequently have lost the protection of the "grandfather clause" provision, and would then have had to comply with the recently enacted requirements for the maintenance of a branch office in order to obtain a new branch office license from the Board.

The Board argues that the deletion of these words from the statute cannot be said to reflect legislative intent. It bases its contention on the fact that prior to the 1959 amendment of section 3077, the Board had taken the position that branch office licenses were not transferable and had made this position known to all of its licentiates. Thus, argues the Board, in light of this past administrative history, "the Legislature in 1959 could feel secure in knowing that licenses would not be transferred upon the removal or abandonment of the licensed premises" and "The inclusion of the term 'removal or abandonment' would have been but the statement of a tautology." There are two responses to this contention. In the first place, although prior to 1959 the Board had declared its policy to be against the transferability of branch office licenses, it allowed a relocation of a branch office simply by issuing a new branch office license. Therefore, although it may be accurate to say that the Legislature in deciding to delete the words "removal, or abandonment" from the 1959 version of section 3077, subdivision (i), could feel secure in knowing that licenses would not be transferred upon the removal or abandonment of the licensed premises, it would be fallacious reasoning to say that the Legislature, without including the words "removal, or abandonment," could feel secure in knowing that a relocation of a branch office could not be accomplished by the same indirect means as it had been accomplished prior to 1959, that is, by the issuance of a new branch office license. In the second place, the Board overlooks the fact that prior to the amending of section 3077, not only was it its position that a branch office license was not transferable from one location to another, it also maintained that a change in ownership of a branch office terminated the effectiveness of the branch office license. Such a change of ownership obviously falls within the definition of a sale. Nevertheless, the Legislature was apparently not willing to delete the entire second sentence from subdivision (i) on the basis that the Board had previously taken an identical position, and therefore that the Legislature could feel secure in knowing that the sale of a branch office would terminate the branch office license which had been issued for that location.

We conclude, therefore, that if the Legislature felt it necessary to include one provision in subdivision (i) in spite of the fact that this provision simply reiterated the position taken by the Board, the deletion by the Legislature of another provision from the same subdivision cannot be explained on the basis that it was merely reiterative of the Board's position and thus constituted surplusage.

The Board also relies upon the rule that the administrative construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. The argument is made that the Board, buttressed by an opinion of the Attorney General, has since 1957 taken the position that branch office licenses are not transferable. The extent and limitation of the rule as to administrative interpretation of a statute have already been discussed. Insofar as the instant argument is concerned, we reiterate our position that the issue here is not whether branch office licenses are transferable, but whether the Board can prevent an optometrist from relocating and continuing to operate a branch office.
▌ Concluding as we do that the Board does not have such authority, it must naturally find a procedure by which petitioners may obtain branch office licenses for their relocated branch offices; however, whether it wishes to follow its original procedure of issuing new branch office licenses while continuing to refuse to transfer branch office licenses, or whether it will reverse its policy concerning the nontransferability of a branch office license is, we believe, beyond the scope of this appeal and constitutes an internal matter for the Board itself to determine. We note, moreover, that the Board has not always adhered to the administrative interpretation urged by it in view of the testimony of the Board officer in the Rich hearing to the effect that since the 1959 amendment to section 3077 the Board has granted in one case and was prepared to grant in another a request for a transfer of a branch office license to another location such requests having been predicated upon economic factors.

It is argued further by the Board that "Section 3077(i) should not be so construed as to give . . . [petitioners] and other 'grandfather' branch office licensees a competitive advantage nor to perpetuate the non-uniformity created by its provisions." ▌ In response to this contention, we need only state that petitioners possessed a so-called "competitive advantage" on October 1, 1959 and that the Legislature saw

fit to give protection to this "competitive advantage," subject to the proviso that it be lost in the event that the "grandfather licensees" sold their branch offices. Accordingly, regardless of the Board's or our own particular feeling as to the desirability of the competitive advantage which petitioners possess by virtue of section 3077, subdivision (i), and regardless of the rules of construction which require strict construction of such "grandfather clauses" which by their very nature perpetuate "competitive advantages" and nonuniformity, in the instant case we are doing nothing more than adhering to the intent of the Legislature when we hold that petitioners are entitled to relocate their branch offices and thus to retain the competitive advantage which they were given by section 3077, subdivision (i).

Nor do we find anything in the case of *Harris* v. *Alcoholic Bev. etc. Appeals Board,* 61 Cal.2d 305 [38 Cal.Rptr. 409, 392 P.2d 1], which compels or suggests a result contrary to that which we have reached. In *Harris,* a licensed manufacturer of distilled spirits also held a distilled spirits wholesaler's license under section 23774 which provided that "The provisions of Sections 23771 and 23772 [prohibiting a manufacturer from holding a wholesaler's license] do not prevent the issuance of a distilled spirits wholesale license to any person who, on July 1, 1937, owned or operated a business which for five years immediately preceding that date had maintained and operated in this State a bona fide jobbing and distributing establishment for the sale to retail dealers of goods, wares, and merchandise, the major portion of which business . . . was . . . other than alcoholic beverages." The licensed manufacturer was thereafter acquired by merger by another manufacturer of distilled spirits not otherwise able to possess a wholesaler's license. In holding that the latter manufacturer was not, through such merger, entitled to possess the wholesaler's license, the Supreme Court, declaring that it was never intended that the *right* of dual licensing would be transferable, noted that the Legislature intended to establish a uniform system of regulation whereby through the process of natural attrition those qualified for the exemption would gradually diminish in number until no more existed. The Supreme Court stated, further, that "grandfather clause" provisions create an "undesirable nonuniformity in the legislative scheme of regulation, and perpetuation thereof through transfers and business rearrangements, as in applicant's case, would defeat the ultimate legislative objective,"

and that the "dual licensing provisions . . . should not continue to exist to the prospective advantage of those who would acquire the licensee's assets, right to do business, or even the licensee itself." (P. 310.) *Harris* is readily distinguishable from the present case because it involved a transfer of the licensee's assets, business, and license to another. In the instant cases, petitioners are not transferring their businesses or licenses to third persons, but merely desire to change the physical situs of their branch offices.

The contention is also made by the Board that to permit the transfer of a branch office license "allows the multi-office entrepreneur to revive a business, and indeed, to create one under the color of the old license," that the exemption in section 3077 was for the protection of the optometrist's investment in the particular branch, and that when the purposes of the branch have failed the purpose of the exemption should also fail. The fallacy of these assertions lies in the fact that a relocation of a branch office does not necessarily constitute a revival of a business or a creation of a new one, nor does it indicate that the purpose of the original branch office failed or that the licensee has lost his original investment. To the contrary, the licensee's business investment will be in most cases, and clearly is in the instant cases, vitally alive. It is such a business investment, and the competitive advantage enjoyed by the optometrist as a result thereof, that the Legislature intended to protect by the inclusion of subdivision (i) in its amendments to section 3077.

 Finally, concerning the purpose of section 3077 and specifically that of subdivision (i), we wish to make it clear that we do not consider this statute to be analogous to some other licensing statutes which the Board calls to our attention, e.g., sections 7628 (funeral directors and embalmers); 23958, 23988, 24070, 24076 (alcoholic beverages). Those statutes undoubtedly indicate a concern on the part of the Legislature as to the location of these businesses and stores. On the other hand, the Legislature is not concerned with regulating and controlling the location of optometrists' offices, but has merely concerned itself with limiting the *number* of such offices. As already indicated, the "grandfather clause" of subdivision (i) gives protection not to the specifically located branch offices, but to the number of branch offices operated by an optometrist on the October 1, 1959 date. This wording of the protective clause is consistent with the lack of concern on

the part of the Legislature as to the location of the branch offices, and indicates instead its intention and purpose to protect the investments of optometrists in that number of branch offices which they had in operation on October 1, 1959.

The judgment in each of the cases is affirmed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied July 28, 1965, and appellants' petition for a hearing by the Supreme Court was denied September 2, 1965. Mosk, J., did not participate therein.