TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 86-706 |
| of | : | JUNE 18, 1987 |
| JOHN K. VAN DE KAMP<br>Attorney General | : | |
| RONALD M. WEISKOPF<br>Deputy Attorney General | : | |

_____

        THE HONORABLE WILLIAM M. MEDIGOVICH, Director, Governor's Office of Emergency Services, has requested an opinion on the following question:

        Are the requirements of chapter 6.95 of division 20 of the Health and Safety Code for certain entities to prepare hazardous materials release response plans applicable to the University of California, the state universities, the community colleges, or to state agencies generally?

CONCLUSION

        The requirements of chapter 6.95 of division 20 of the Health and Safety Code for certain entities to prepare hazardous materials release response plans are not applicable to the University of California, to the state universities, to community colleges, or to state agencies generally.

1

86-706

ANALYSIS

Prior to the enactment of chapter 6.95 (§§ 25500- 25520) of division 20 of the Health and Safety Code in 1985 (Stats. 1985, ch. 1167, § 1), basic information on the location, type, quantity and health risks of hazardous materials handled by businesses, which could be accidentally released into the environment, was not automatically readily available on the local level to firefighters, health officials, planners, and other interested persons. (§ 25500.) The Legislature found that the ready availability of such information was necessary in order to protect the public health and safety and environment from the release or threatened release of such materials. (*Ibid.*) Accordingly, it enacted chapter 6.95 to provide a formal mechanism whereby the information would be locally collected, collated, stored and made available as necessary to enable an informed response to be made to an accidental release of hazardous materials.[1]

Under the chapter, any "business" which handles hazardous materials must establish and implement a "business plan" for emergency response to their release or threatened release. (§ 25503.5, subd. (a).)[2] The plans must accord with minimum

---

[1] Of course at the time mechanisms already existed for responding to releases of hazardous substances, among which were provisions for state toxic disaster planning under the California Emergency Services Act (Gov. Code, tit. 2, div. 1, ch. 7, § 8550, et seq.) whereby the Office of Emergency Services was to maintain a notification and reporting system to facilitate operation of the integrated state toxic response procedures contained in the state toxic disaster contingency plan. (*Id.*, § 8574.8; cf., *id.*, ch. 3.7.) (See 65 Ops.Cal.Atty.Gen. 32, 35 (1985).) The effort however was statewide in its centralization and implementation. (*Id.*, § 8574.8; see also, Veh. Code, § 2450, et seq., the Hazardous Substances Highway Spill and Abatement Act; 65 Ops.Cal.Atty.Gen., *supra*, at p. 34.).) While some local entities had requirements for business to submit data on hazardous materials they handled, state law did not require that local effort to be made. Chapter 6.95 now does.

[2] A "hazardous material" is ". . . any material that because of its quantity, concentration, or physical or chemical characteristics, poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment." "Hazardous materials" include, but are not limited to, hazardous substances, hazardous waste, and "any material which a handler or the administering agency has a reasonable basis for believing that it would be injurious to the health and safety of persons or harmful to the environment if released into the workplace or the environment." (§ 25501, subd. (j).) "Hazardous substances" are defined by subdivision (k) of section 25501; "hazardous waste" by its subdivision (l). (See also §§ 25115, 25117, 25316.)

Release includes, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, unless permitted or authorized by a regulatory agency." (§ 25501, subd. (n).)

2

standards adopted by the Office of Emergency Services after consultation with the State Fire Marshal and other appropriate public entities (§§ 25503, subd. (a); 25503.5, subd. (a)) and must include an inventory of hazardous substances and a categorization of hazardous wastes handled by the business, and sufficient information on how and where they are handled to allow fire, safety, health, and other appropriate personnel to prepare adequate emergency responses to potential releases of them. (§§ 25504, subd. (a); 25505, subd. (d); 25509, 25509.3, 25510.) The business plans must also (1) set forth emergency response plans and procedures to deal with a reportable release or threatened release of a hazardous material (including, (a) immediate notification to local emergency rescue personnel, (b) procedures for mitigation to minimize potential harm or damage to persons, property, or the environment, and (c) evacuation plans and procedures for the business site), and (2) training for employees in safety procedures for that eventuality. (§ 25504, subds. (b), (c).)

The duty for implementing chapter 6.95 is placed on the counties (§ 25502, subd. (a)), but a city may, by ordinance or resolution, assume that responsibility within its jurisdiction. (*Id.*, subd. (b).) A county, and any such city assuming the responsibility, must designate one of its departments, offices, or other agencies as an "administering agency" responsible for administering and enforcing the mechanism of chapter 6.95. (*Id.*, subd. (c); cf. § 25501, subd. (a).) That is done through an "area plan" for emergency response to the actual or threatened release of hazardous materials adopted by the administering agency. These area plans--which also must meet minimum standards set by the Office of Emergency Services (§ 25503, subd. (a))-- provide for (1) procedures and protocols for emergency rescue personnel; (2) preemergency planning; (3) notification and coordination of onsite activities with state, local and federal agencies, responsible parties, and special districts; (4) training of appropriate employees; (5) required supplies and information; and (6) access to emergency response contractors and hazardous waste disposal sites. (*Id.*, subd. (c).) In addition, the administering agency must also provide the Office of Emergency Planning with (1) the basic provisions of a plan to conduct onsite inspection of businesses subject to chapter 6.95 to ensure compliance with it and to identify safety hazards that could cause or contribute to a release of hazardous material into the workplace or environment, and (2) a plan to institute a data management system for efficient access to and utilization of the information collected under the chapter. (*Id.*, subd. (e).)

Any business which "handles" hazardous materials (cf., fn. 2, *ante*) must submit its "business plan", reviewed biennially, to the administering agency (§ 22505, subds. (a), (b), (c); cf. § 25501, subd. (i) ("handler")), and it must also annually submit to

---

"Handle" is defined to include: "to use, generate, process, produce, package, treat, store, emit, discharge, or dispose of a hazardous material in any fashion." (§ 25501, subd. (h).)

3

the agency an inventory of them on an "inventory form." (§ 25505, subd. (d).) In addition, the business must report to the agency and to the Office of Emergency Services, any release or threatened release of hazardous material immediately upon discovery. (§ 25507.)[3]

Administering agencies are required to maintain records of all "business plans" and index them by street address and company name. (§ 25505.) The plans and their revisions are available to public inspection, except for those portions specifying the precise locations where hazardous materials are handled. (*Ibid.*) The entire plan, however, is available to any state or local agency (*ibid.*) and an agency must provide all information obtained from the business' completed annual inventory form to emergency rescue personnel upon request on a 24-hour basis. (§ 25503.5, subd. (c).)[4]

We thus see how Chapter 6.95 fills the prior void (cf. fn. 1, *ante*) by establishing a mechanism whereby information about hazardous materials handled by businesses in the state is collected locally by a known agency which can then make it available appropriately as needed. Needless to say, the chapter imposes a burden of responsibility upon "businesses" to adopt acceptable plans and provide annual inventories. (Cf., fn. 3, *ante*.) We are asked whether the University of California, the state universities, the community colleges, and state agencies generally, are subject to its requirements. We conclude that they are not.

Chapter 6.95 imposes its obligations on "businesses" that handle hazardous materials, section 25503.5, subdivision (a) thereof providing:

---

[3] Any "person" or "business" which violates the provisions dealing with business plans and inventory reporting (§§ 25503.5-25505, 25508-25510) is civilly liable to the administering county or city for up to $2,000 for each day the violation occurs; a knowing violation after reasonable notice of it, increases the penalty to $5,000 a day. (§ 25514.) A failure to report a release or threatened release of hazardous materials under section 25507 carries a fine of up to $25,000 a day of violation and/or imprisonment in county jail; a second violation raises the possibility to $50,000 a day and state prison. (§ 25515.) The term "person" is not defined in chapter 6.95.

[4] "Emergency rescue personnel" is defined to mean:

". . . any public employee, including, but not limited to, any fireman, firefighter, or emergency rescue personnel, as defined in Section 245.1 of the Penal Code, who responds to any condition caused, in whole or in part, by a hazardous material that jeopardizes, or could jeopardize, public health or safety or the environment." (§ 25501, subd. (f).)

4

"Any business . . . which handles a hazardous material or a mixture containing a hazardous material which has a quantity at any one time during the reporting year equal to, or greater than, a total weight of 500 pounds, or a total volume of 55 gallons, or 200 cubic feet at standard temperature and pressure for compressed gas, shall establish and implement a business plan for emergency response to a release or threatened release of a hazardous material in accordance with the standards in the regulations adopted pursuant to Section 25503."[5]

(Cf., § 25501, subd. (i): "handler" means "any business which handles a hazardous material.")

"Business" is defined by section 25501, subdivision (c) to mean:

". . . an employer, self-employed individual, trust, firm, joint stock company, corporation, partnership, or association.  For purposes of this chapter, 'business' includes a business organized for profit and a nonprofit business."

The Legislature has said that this definition is to govern the construction of chapter 6.95 unless the context indicates otherwise.  (§ 25501; cf., *Rideau* v. *Togrimson* (1939) 12 Cal.2d 633, 636; *In re Marriage of Stephens* (1984) 156 Cal.App.3d 909, 913.)  It might be argued that since the University of California, the state universities, the community colleges, and state agencies generally are employers, that they are to be covered by the rubric of chapter 6.95.  However, we do not believe the matter may be resolved that simply.

As a general rule, public agencies are not considered to be bound by general words of a statute which set forth duties or which limit rights and interests unless they are included within its directive, either expressly or by necessary implication, and their being included does not result in an infringement upon their sovereign powers. (See,

---

[5] Exceptions are made for: hazardous material contained solely in a consumer product for direct distribution to and use by the general public (unless the administering agency finds that the handling of certain quantities of the product warrants the submission of a business plan); certain hazardous substances that are found not to present a danger if released; unusual circumstances justifying exemptions for a handler where the exemption would not pose a significant hazard to human health or safety or affect the ability of the agency and emergency rescue personnel to effectively respond to the release of a hazardous material; and businesses operating a farm for cultivating the soil or raising or harvesting agricultural or horticultural commodities if certain conditions are met.  (§ 25503.5, subd. (b).)

e.g., *Regents of University of California* v. *Superior Court* (1976) 17 Cal.3d 533, 536; *C.J. Kubach Co.* v. *McGuire* (1926) 199 Cal. 215, 217; *Nutter* v. *City of Santa Monica* (1946) 74 Cal.App.2d 292, 300; *Philbrook* v. *State Personnel Board* (1942) 53 Cal.App.2d 222, 228; 67 Ops.Cal.Atty.Gen. 256, 259, fn. 2 (1984); 65 Ops.Cal.Atty.Gen. 88, 91 (1982); 63 Ops.Cal.Atty.Gen. 616, 620 (1980); 36 Ops.Cal.Atty.Gen. 179, 180 (1960).)[6] The Legislature has not expressly included public agencies within the ambit of chapter 6.95 as it has in kindred legislation[7] and one would ordinarily presume from the fact of such other inclusion that they were not meant to be included here:

> "[W]here the Legislature omits a particular provision in a later enactment related to the same subject matter, [that] deliberate omission indicates a different intention which may not be supplanted in the process of . . . construction." (*Kaiser Steel Corp.* v. *County of Solano* (1979) 90 Cal.App.3d 662, 667; see also, *Fogarty* v. *Superior Court* (1981) 117 Cal.App.3d 316, 320; *Marsh* v. *Edwards Theatres Circuit, Inc.* (1976) 64 Cal.App.3d 881, 891.)

Put simply, if the Legislature did mean to include state agencies within the workings of chapter 6.95, the kindred legislation demonstrates it knew how to do so. (Cf., *Safer* v.

---

[6] The University is essentially a state institution (*Estate of Purington* (1926) 199 Cal. 661, 661, *Estate of Royer* (1899) 123 Cal. 614, 623), and has been deemed a state agency for certain purposes (see, e.g. *Regents of University of California* v. *City of Santa Monica* (1978) 77 Cal.App.3d 130, 135-137; 63 Ops.Cal.Atty.Gen. 231, 135-137 (1980).) And while it is intended to operate as independently as possible, "it is well settled that general police power regulations governing private parties and corporations may be applied to the University." (*San Francisco Labor Council* v. *Regents of University of California* (1980) 26 Cal.3d 785, 789; *Wallace* v. *Regents of the University of California* (1925) 75 Cal.App. 274, 278; 20 Ops.Cal.Atty.Gen. 30, 36 (1952).) The state universities (62 Ops.Cal.Atty.Gen. 443, 446, 447 (1979)) and the community college districts (*Butler* v. *Compton Junior College Dist.* (1947) 77 Cal.App.2d 717, 728; 70 Ops.Cal.Atty.Gen. [#86-703; May 19, 1987, at p. 4]) have also been considered agencies of the state.

[7] See, e.g., Health & Saf. Code, div. 20, ch. 6.5. (Hazardous Waste Management Control), 25118: "person" means "an individual, . . . business concern, corporation . . . [and] also includes any city, county, district, and the state or any department or agency thereof. . . ."; *Id.*, ch. 6.7 (Underground Storage of Hazardous Substances), 25281, subd. (h): "person" means "an individual, trust, firm, corporation . . . [and] also includes any city, county, district, the state, any department or agency thereof . . ."; (*Id.*, ch. 6.8 (Hazardous Substance Account to provide funding for response (abatement, clean-up) to releases of hazardous substances that pose a threat to the public health or environment), § 25319: "'Person' . . . also includes . . . the state or any department or agency thereof."

6

*Superior Court* (1975) 15 Cal.3d 230, 238; *Board of Trustees* v. *Judge* (1975) 50 Cal.App.3d 920, 927.)

Nevertheless, it still may be that the Legislature did intend to include the subject entities within the working of chapter 6.95 and we must determine that possibility of implied inclusion. To explore it, "it is proper to consider all matters which, under the rule[s] of statutory interpretation, shed light on the legislative intention. [Citation.]" (*People* v. *Centr-O-Mart* (1950) 34 Cal.2d 702, 704.)

We first examine the words at issue to determine whether their meaning is ambiguous. (*Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570; *People* v. *Knowles* (1950) 35 Cal.2d 175, 182.) The salient question, of course, is the meaning of the term "business", but inasmuch as that has already been specifically defined for the workings of chapter 6.95 ( 25501, subd. (c)), it is the meaning of the word "employer" as used in the definition that focuses concern: Was that meant to include public employers?[8] Once again, the term "business" is defined by section 25501, subdivision (c) to mean:

" . . . an employer, self-employed individual, trust, firm, joint stock company, corporation, partnership, or association. For purposes of this

---

[8] There is nothing inherently impermissible in such inclusion. The rule that calls for exclusion of governmental entities from the operational embrace of the general words of a statute in the absence of express provisions to the contrary (see, e.g., fn. 7, *ante*) is predicated on the notion that their inclusion would result in an infringement upon sovereign powers; "'[w]here no infringement of sovereign powers would result, the reason underlying [the] rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only. [Citations.]'" (*City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199; accord, *Regents of University of California* v. *Superior Court, supra*, 17 Cal.3d 533, 536.) Thus, under the latter principle, "government entities have been held subject to legislation which by its terms applies simply to any 'person.' [Citations.]" (63 Ops.Cal.Atty.Gen. 616, 620, *supra*, and cases cited threat.) We see no significant difference in operative effect in this respect between the word "person" and the word "employer." (See, *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 54-57.) The question would still be whether "the particular legislation affects the fundamental purposes and functions of the governmental body. Immunity is granted if statutorily mandated activities are impaired. [Citations], while no exemption is provided when the agency's public purposes are unaffectd. [Citations.]" (63 Ops.Cal.Atty.Gen. *supra*, at 620, 621; accord, 62 Ops.Cal. Atty.Gen. 140, 142 (1979).) Since we are going to conclude from the statutory wording and its legislative history that the Legislature did not mean to subsume governmental agencies under the rubric of chapter 6.95's "employer", we need not explore this other area.

7

chapter, 'business' includes a business organized for profit and a nonprofit business."

The noteworthy aspect about the "operative" part of the definition[9] is that the term "employer" seems very out of place.  All of the other terms--self-employed individual, trust, firm, joint stock company, corporation, partnership, association--are forms of business organization; the term "employer" is not.  Nevertheless, that it is set among them can give us a clue to the scope of its intended meaning. Under the doctrine of *noscitur a sociis*, where the meaning of a particular word is doubtful when taken by itself, the doubt may be removed and the true meaning ascertained by reference to the meaning of its associated words.  (58 Cal.Jur.3d, *Statutes*, § 136; cf. *People* v. *Stout* (1971) 18 Cal.App.3d 172, 177; *People* v. *Buese* (1963) 220 Cal.App.2d 802, 807; 64 Ops.Cal.Atty.Gen. 173, 177 (1981).)  Here the terms "associated with" the word "employer" are not only forms of business organization, but are terms which apply to the conduct of private, non-governmental activity (cf., 70 Ops.Cal.Atty.Gen. [slip opn., *supra*, at p. 4]) and under the just-mentioned doctrine we should expect that the Legislature used the term "employer" with a like cast.  (See 67 Ops.Cal.Atty.Gen. 355, 360 (1984).)[10]  Any doubt in that regard is quickly disspelled by the legislative history of the definitional section.

---

[9] Inasmuch as "business" is also defined in section 25501, subdivision (c) to include "a nonprofit business," it has been suggested that indicates a legislative intent for government agencies to be included in the overall definition.  However, rather than help matters, that part of the definition, being cast in crucial aspect with the very term it seeks to help define, invites circularity and compounds the problem.  (Cf., 69 Ops.Cal.Atty.Gen. 88, 93 (1983).)

[10] Along this line we would also note that even if the term "business" were not specifically defined to limit our exploration of its meaning, including governmental agencies within its rubric would still give us pause. Elementary statutory construction demands that statutory words be given their ordinary and usual meaning. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.2d 692, 698; *People* v. *Belleci* (1979) 24 Cal.3d 879, 884; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.3d 591, 606-607), and not a tortured construction seeking hidden meanings.  (*Madrid* v. *Justice Court* (1975) 52 Cal.App.3d 819, 824; *Rich* v. *State Board of Optometry*, *supra*, at 604; *People* v. *Knowles* (1950) 35 Cal.2d 175, 183.) The ordinary import of the term business suggests private proprietary and commercial activity, and not governmental function.  (Cf., 70 Ops.Cal.Atty.Gen. [slip opn., *supra*, at p. 4] (public agencies are not "corporations").)  When the Legislature has meant to include non-commercial or proprietary activity within a definition of "business", it has specifically done so.  (See, e.g., 25110.5 (definition of "business" for the working purpose of chapter 6.5 (Hazardous Waste Management Control).)  That it has not done so here "is significant to show that a different intention existed." (*Anthony* v. *Superior Court* (1980) 109 Cal.App.3d 346, 355-356.)

8

The legislative history of a statute is a most valuable tool to ascertain the Legislature's intentions regarding a perceived ambiguity. (*Sand* v. *Superior Court*, *supra*, 34 Cal.3d 567, 570; *Rich* v. *State Board of Optometry*, *supra*, 235 Cal.App.2d 591, 607; 65 Ops.Cal.Atty.Gen. 32, 35, *supra*.) Here the gestation of section 25501, subdivision (c) is particularly telling.

When the bill which wrought chapter 6.95 was first introduced in the Assembly on March 8, 1985, (AB 2185), section 25501, subdivision (c) defined the term "business" as it did when finally enacted. However, on April 15, 1985, by amendments to the bill in the Assembly, the definition was changed to read as follows:

"(c) 'Business' means an employer, self-employed individual, trust, firm, joint stock company, corporation, partnership, association, *city, county, district, and the state, or any department or agency thereof.* For purposes of this chapter, a business includes a business organized for profit and a nonprofit business." (Emphasis added.)

So amended, the definition of "business" clearly embraced governmental entities and agencies of the state. (Compare, fn. 7, *ante*.) But just as clearly, it placed them in apposition to private entities where the term "employer" was originally found. Since the purpose of an amendment is to make a meaningful change to what went before (cf., *Judson Steel Corp.* v. *Workers' Comp. Appeal Bd.* (1978) 22 Cal.3d 658, 666, fn. 6; *Jordan* v. *Consolidated Mut. Ins. Co.* (1976) 59 Cal.App.3d 26, 48; 67 Ops.Cal.Atty.Gen. 355, 359, fn. 5, *supra*; 64 Ops.Cal.Atty.Gen. 240, 255 (1981)) we can presume therefrom that if the word "employer" would have already sufficed to embrace governmental or public employers, the amendment would not have been necessary to bring those public bodies within the definitional rubric of "business". (Cf., *White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 681; *Fields* v. *Eu* (1976) 18 Cal.3d 322, 328-329.)

The subdivision so amended--with public entities specifically brought within its definition of "business" and hence the coverage of chapter 6.95--survived further amendments to the bill in the Assembly on May 30, June 12, and July 11. However, when the bill was amended in the Senate on September 5, 1985, the definition of "business" set forth in section 25501, subdivision (c) was changed back to its original, and finally enacted, form. Again, we can only learn from that deletion of all references to bodies politic in the definition of "business" that (a) such entities were not to be included thereunder; and (b) that the term "employer" should not now suffice, as it did not before, to bring them thereunder. (Cf., 67 Ops.Cal. Atty.Gen. 355, 359, fn. 5, *supra*.)

When, as here, the Legislature rejects language from a bill, it is most persuasive to the conclusion that the law as enacted should not be construed to contain it.

9

(*Stroh* v. *Midway Restaurants Systems, Inc.* (1986) 180 Cal.3d 1040, 1055; *Ventura* v. *City of San Jose* (1984) 154 Cal.App.3d 1076, 1080; *Ford Motor Co.* v. *County of Tulare* (1983) 145 Cal.App.3d 688, 692; *Rich* v. *State Board of Optometry*, *supra*, 235 Cal.App.2d 591, 607.)  Accordingly, we conclude that chapter 6.95 was not meant to apply to public agency employers, such as the University of California, the state universities, the community colleges, or state agencies generally.

The statutory situation here is thus markedly different from that presented with similar issues before where the language used was sufficiently elastic to permit a broad interpretation that could accommodate a legislative purpose to embrace public entities.  (See e.g., 36 Ops.Cal. Atty.Gen. 179 (1960) (Earthquake Protection Law to cover "every building of any character"); 20 Ops.Cal.Atty.Gen. 30 (1952) (Health & Saf. Code, § 13143:  Fire Marshal to adopt minimum standards for fire protection for "any building or structure used or intended for [certain uses]").)  Whatever other differences may exist, section 25501, subdivision (c) is not so accommodating.  Though it too uses the word "any", broad as it is, it is still but an adjective modifying "business" and it is that noun which determines the scope of chapter 6.95.  Regarding it, we have shown how the legislative history of its defined meaning makes it clear beyond doubt's peradventure that the term "business" was not meant to apply to public entities as employers.  Again, the true intent and meaning of a statute is not found by implying hidden meanings in words (*Madrid* v. *Justice Court*, *supra*, 52 Cal.App.3d 819, 824) and however laudatory a statutory purpose, one should not ". . . add to or alter the words of [a] statute to accomplish a purpose that does not appear on [its] face or from its legislative history . . .; nor should [one] seek hidden meanings not suggested by the statute or by the available extrinsic aids.  [Citations.]" (*Rich* v. *State Board of Optometry*, *supra*, 235 Cal.app.3d 591, 604.)

The words of section 25501, subdivision (c) itself convince that the definition of "business" was not meant to apply to public employers and the legislative history of the subdivision fortifies that conclusion.  Therefore, as they would not be "businesses" within its definitional structure, we conclude that the requirements of chapter 6.95 of division 20 of the Health and Safety Code do not apply to the University of California, the state universities, the community colleges, or to state agencies generally.

*****

86-706