[No. A020144. First Dist., Div. Two. Oct. 1, 1986.]

TERMINAL PLAZA CORPORATION, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
FIVE FREMONT CENTER ASSOCIATES,
Real Party in Interest and Respondent.

816

**Counsel**

William A. Falik, Jeffrey B. Maso, Hodge, Buchanan, Falik & Dupree and Freytag, LaForce, Rubinstein, Teofan & Falik for Plaintiff and Appellant.

George Agnost and Louise H. Renne, City Attorneys, Paula Jesson, Melba Yee and Andrew W. Schwartz, Deputy City Attorneys, for Defendants and Respondents.

Pillsbury, Madison & Sutro, Walter R. Allan and Kirke M. Hasson for Real Party in Interest and Respondent.

**Opinion**

**KLINE, P. J.—**

Introduction

Terminal Plaza Corporation (TPC) appeals a judgment of the San Francisco Superior Court denying issuance of a writ of mandate compelling the City and County of San Francisco, and certain of its departments and officers (City) to enforce a portion of a planning commission resolution conditioning the development of Five Fremont Center (a 43-story office building being developed by respondent Five Fremont Center Associates (Five Fremont)) on property immediately adjacent to property owned in common by TPC and Five Fremont. TPC contends (1) that City planning commission reso-

lution 8877 requires respondent Five Fremont immediately to construct a pedestrianway on property owned by Five Fremont and (2) that City respondents have a clear and present ministerial duty to enforce this asserted requirement.

## Facts

At issue is the interpretation of city planning commission resolution 8877 and the appropriateness of mandate to enforce that resolution. The pertinent portion of the resolution, as amended by the board of permit appeals, provides: "The project sponsors shall develop a mid-block pedestrian way connecting Market Street, preferably at the existing plaza west of the 425 Market Street building and Mission Street, and linked to a pedestrian bridge over Mission Street to Transbay Terminal. The pedestrianway shall be of adequate, comfortable dimensions, at least 12 feet in width, and shall feature such amenities as will encourage use of this pedestrianway as an alternative to First and/or Fremont Street sidewalks. The pedestrianway shall remain open and available to the general public a minimum of 12 hours daily. Until such time as the bridge is constructed, the southern end of the pedestrianway shall terminate within the 5 Fremont Center development, and pedestrian access from the pedestrianway to the north sidewalk of Mission Street mid-block at grade shall be prohibited by an appropriate design treatment. This treatment shall not interrupt needed delivery access to the Terminal Plaza Building. The mid-block pedestrianway shall be immediately accessible from the ground floor lobby and elevator bank of the 5 Fremont Tower. . . . It is understood that no use of Lot 6A for a pedestrian bridge, pedestrian mall, or otherwise can occur without the consent of Terminal Plaza Corporation, except such uses as may be permitted under the existing easement rights held by the Project owner."

### *Background*

At the time the petition for a writ was filed, respondent Five Fremont[1] was in the process of constructing, and has subsequently completed construction of, a 43-story high-rise office tower and a separate low-rise retail

[1]Five Fremont is a joint venture, composed of Sequoia Ventures, Inc. (an affiliate of Bechtel), the Walter H. Shorenstein Company, and the Metropolitan Life Insurance Company.

structure in San Francisco at Fremont and Mission Streets.[2] The high-rise tower is located at the southeasterly portion of the project area on lot 7 and a portion of lot 6. Lot 6A (owned jointly by Five Fremont and TPC) is located at the western boundary of lot 7. The distance between the tower and the boundary between lots 7 and 6A is approximately four and one-half feet.

*The Environmental Impact Report*

On March 12, 1981, the San Francisco City Planning Commission approved a building permit for construction of Five Fremont Center. In approving the building permit, the City planning commission was concerned about the significantly increased pedestrian traffic expected to be generated by the project. All aspects of the project, including the site plan showing the location of the perimeter walls of the office tower in relation to the boundary lines of the project site, were reviewed by the staff of the City planning department in connection with the preparation of the 220-page final environmental impact report (final EIR). During this review process the City conceived the idea of requiring Five Fremont to construct a pedestrianway to accommodate the increased foot traffic between the Transbay Transit Terminal and the areas north of Mission Street. The pedestrianway was contemplated as a City project for the benefit of the public.

In the northerly portion of the project area, the pedestrianway was to run south from the north property line through the lowrise structure to the plaza between that structure and the tower area. In the southerly portion of the project area, which is the portion at issue in this case, the pedestrianway was intended to connect the plaza with a proposed pedestrian bridge from the Transbay Terminal over Mission Street. During the study of the project, Five Fremont rejected the possibility of running the proposed southern extension of the pedestrianway through the tower building itself.

In the course of the City planning commission's review of the draft environmental impact report, the City planning commission held public

[2]The low-rise structure and a pedestrian mall are located in the northerly portion of the project area on what are known as lots 4, 5, 6 and 10. The high-rise tower is located at the southeasterly portion of the project area on lot 7 and a portion of lot 6. To the west of and adjacent to lot 7 is lot 6A, a 16-foot-wide private deadend alleyway located at mid-block, running north approximately 113 feet into the block from the northerly side of Mission Street. To the west of lot 6A is lot 8, on which the building owned by appellant TPC is located. TPC owns a one-third undivided fee interest in lot 6A, and Five Fremont owns the remaining two-thirds undivided fee interest. TPC and Five Fremont each have easements for roadway, light and air purposes over lot 6A.

Terminal Plaza utilizes lot 6A for, among other things, truck access for deliveries to its tenants. This use is specifically provided for in the underlying fee and easement grants to Terminal Plaza's predecessors in 1913.

hearings. A project architect noted that it had originally been hoped that lot 6A could be used for the southern extension of the pedestrianway, but that TPC had objected. He then pointed out that, without the use of lot 6A, there would be a "four-foot wide walkway alongside of the new tower. . . ." The contingent nature of the proposed pedestrian bridge and the southern portion of the pedestrianway was also discussed. Commissioner Karasick expressly noted that, "if a bridge is not constructed, then that pedestrian way will be void in effect." TPC was represented by counsel at the hearings and made presentations of its views to the commissioners. The final EIR, written by the department of planning, recognized that Five Fremont owned an undivided two-third interest in lot 6A and that TPC owned an undivided one-third interest. It also recognized that no use could be made of lot 6A without consideration of TPC's property interests. Although the EIR listed three possible ways that a pedestrianway requirement could be met, it noted that Five Fremont had rejected the alternative of making part of the interior tower space a pedestrianway.[3]

*Resolution 8877*

On March 12, 1981, the planning commission approved construction of the project in resolution 8877. That resolution adopted the City planning department's suggestion concerning the wording of the pedestrianway obligation. The resolution noted that the design plans included "provision for the eventual bridging of Mission Street for direct pedestrian access to Transbay Terminal, [and] accomodations for a possible thru block pedestrian link to Market Street." It upheld the building application subject to condition 5.

The words "at least 12 feet in width" were adopted without comment at the end of the hearing at the suggestion of the project staff. Resolution 8877 specifically approved plans showing the physical dimensions and location of the high-rise tower.

Respondents contend that the draftsmen at the planning department and members of the commission "knew and understood the physical fact that the tower wall was 44 feet from Lot 6A and that Five Fremont's obligation to 'develop' a pedestrianway there did not mean that Five Fremont was required to provide all real property interests which might be required for

[3]"The project sponsor has rejected [this] option because the second floor area necessary to complete the connection has been committed to SOHIO for use as a cafeteria, because providing such a connection would result in costly design changes, losses in rental revenues, and, in the opinion of the project architects, would impair the architectural integrity of the Mission St. facade."

the entire pedestrianway, but to make available for the pedestrianway such rights as it had to the west of the tower." In the trial court, respondents submitted numerous declarations of key members of the planning department staff, the planning commission and the board of permit appeals affirming this knowledge and understanding.[4] Appellant, having stipulated below that the court might consider these and other declarations, now contends that the court erred in so doing and that it only stipulated that it had no objection to the declarations if the court determined it properly could consider them.

*Appeal to Board of Permit Appeals*

Following approval by the City planning commission, the department of public works issued the site permit and related demolition permits for the project. TPC appealed the issuance of these permits to the board of permit appeals, and a hearing was held at which the board had before it the City planning commission record, including the final EIR. Five Fremont, with concurrence of the city attorney, agreed at the hearing to addition of a concluding sentence to condition 5 of the transportation section that clarified that lot 6A could not be used by Five Fremont for the pedestrianway or otherwise without TPC's consent except as permitted under Five Fremont's existing easement rights.

During the hearing, the question of how the potential pedestrian bridge could have access to the north, despite the fact that lot 6A was not part of the project, was discussed. Counsel for TPC objected that the question of pedestrian access "is still not resolved." He noted that there were two alternatives to use of lot 6A: use of lot 7 adjacent to the tower or use of a portion of the interior of the tower. He then concluded: "I believe that *both of these alternatives have been rejected by the project sponsor.* At this point there really is no resolution and it really concerns Terminal Plaza, that there is no resolution of this problem." (Italics added.) The deputy city attorney stated that Five Fremont had committed itself to make available to the City all its rights in lot 6A and that the City could acquire additional rights in lot 6A if Five Fremont's rights should not be sufficient: "The City and County always has the option of exercising its eminent domain power to acquire at any time should the City desire to complete that bridge." Counsel for TPC then objected that "the potential threat of condemnation hanging over 6A" was "unfair." The deputy city attorney replied that the board should affirm the commission's decision unless it found an abuse of dis-

[4]Declarations are furnished by all five members of the planning commission who adopted resolution 8877, and four of five members of the board of permit appeals who revised the section, as well as by Zoning Administrator Robert W. Passmore and Planning Staff Supervisor Lucian Blazej.

cretion. The board thereafter adopted the final EIR as its own action. The board also upheld issuance of the site and demolition permits, adding the concluding sentence to condition 5 of resolution 8877. During the hearing, the following colloquy between member Engmann and the attorney for Five Fremont occurred:

"COMMISSIONER ENGMANN: Mr. Renfrew, the question that I have is: Does the project sponsor still have to comply with Condition Five of the City Planning Resolution pertaining to mid-block pedestrian way? And is the project going to—is it the condition that the Southern end of the pedestrian way shall terminate at 5 Fremont Center? Is that condition going to be met? And is that going to be within lot 6 or is it going to be within Lot A?

"MR. RENFREW: It is going to be met and it is not going to be within Lot 6A. *There is a four and one half foot access on our property adjacent to lot 6A. And we have Mr. McGregor*[,] *Project Architect, who is better able to explain his own design.* [¶] *And the property, that is accurate, this is the property right here (indicating). And the property I think has a four and one half foot pass-way there that is adjacent to but not on Lot 6A.*

"COMMISSIONER ENGMANN: I am just trying to assure that even with the deletion of 6A of the development that we don't have any problems in the future meeting the Planning Commission requirement.

"MR. RENFREW: No.

"COMMISSIONER ENGMANN: If you can assure me to that effect then I have no problem with it." (Italics added.)[5]

*Subsequent Events and the Proceeding Below*

Five Fremont proceeded with the construction of the new tower structure pursuant to its permits. On August 6, 1981, TPC's attorneys wrote to the San Francisco City Attorney alleging that Five Fremont was in violation of

[5]Again, the parties in the trial court provided declarations by board members as to their intent and understanding of their action in revising the resolution to omit lot 6A. Four of the five agree that they had no intention of requiring Five Fremont to provide the pedestrianway entirely within its project site, either by moving the tower wall or running the pedestrianway through the tower. The fifth, member Engmann, states in a declaration submitted by appellants that he did not intend to modify the requirements included in the resolution that the pedestrianway connecting Market and Mission Streets "shall be of adequate, comfortable dimensions, at least 12 feet in width," other than to require the consent of TPC to any use of lot 6A.

resolution No. 8877, and protesting the City's intent, expressed at the May 6 board of permit appeals hearing, to use eminent domain powers, if need be, to permit the possible extension of the pedestrianway.

On September 24, 1981, TPC raised the issue again by sending a letter to counsel for Five Fremont, with copies to Dean Macris (director of city planning) and Robery Levy (superintendent, bureau of building inspection). In that letter, TPC asserted that Five Fremont had an obligation to construct a pedestrianway from Market Street through to Mission Street, 12 feet wide, without using any property rights in lot 6A. In reaction, by letter of October 6, 1981, the director of city planning confirmed in writing to the superintendent of building inspection the position of the City planning department that the requirement of resolution No. 8877 is that, "*when and if*" a pedestrian bridge is built, Five Fremont "transfer title of the air right of its two-third undivided interest [in Lot 6A] to the City," that Five Fremont was not in violation of resolution No. 8877, and that the bureau of building inspection should not withhold plan approvals under the site permit for this project on that ground. (Italics in original.)

On October 15, 1981, TPC's attorney wrote to Robert Passmore, the zoning administrator, to present once more TPC's assertions that Five Fremont was in violation of resolution No. 8877. By letter of October 23, 1981, from Five Fremont's counsel to Robert Passmore, with a copy to TPC's counsel, Five Fremont denied TPC's assertions, explaining: "[W]hen the board modified Paragraph 5 to provide that the Lot 6A could be used for a pedestrian passage only with the permission of Terminal Plaza Corporation (except to the extent that Five Fremont Center's easement rights may permit pedestrian use of Lot 6A), it acted with full knowledge that the pedestrian passageway might well be no more than 44 feet wide from Mission Street to the northerly end of Lot 6A absent the consent of Terminal Plaza Corporation." By letter of November 5, 1981, to Five Fremont's counsel, Robert Passmore, as zoning administrator, again confirmed the interpretation of resolution No. 8877 set forth in Five Fremont's letter of October 23, 1981, and stated that Five Fremont was not in violation of the conditions set forth in the resolution.

On December 4, 1981, TPC filed its petition for a writ of mandate, contending that Five Fremont was violating and that the City respondents had refused "to enforce the undisputed requirements of Resolution 8877." TPC prayed for a peremptory writ of mandate "compelling Respondents and Five Fremont Center to provide for the location of the pedestrian bridge, and to provide for and develop the pedestrianway connecting Market and Mission Streets of 12 feet in width, all of which requirements shall be met

without using Lot 6A, unless Five Fremont Center has obtained the prior consent of Terminal Plaza."

The court issued the alternative writ. After consideration of the papers filed by the parties and after argument, the superior court denied TPC's petition for a writ of mandate, and judgment was entered accordingly. The court denied TPC's request for a statement of decision, as untimely filed.[6]

*Issues*

1. Whether resolution 8877 requires Five Fremont currently to build a 12-foot pedestrianway to connect with a pedestrian bridge which may at a future date be built by the City.

2. Whether the trial court properly could consider the declarations of City officials and commission members upon stipulation by the parties.

3. Whether the zoning administrator has discretion to interpret resolution 8877.

4. Assuming Five Fremont to be in violation of the resolution, whether the zoning administrator has prosecutorial discretion to refuse prosecution.

5. Whether the duty to construct the pedestrian way, if any, is a future, contingent duty which may not be enforced by writ of mandate.

6. Whether TPC is entitled to attorneys' fees should it prevail on appeal.

I.

*Whether the Resolution Is Unambiguous*

We must begin with the resolution itself.[7] We recognize that the interpretation of the resolution by the administrative

[6]On October 23, 1981, Five Fremont filed a complaint for partition of lot 6A in San Francisco Superior Court. Appellant TPC contends that the partition action is irrelevant to the instant case, as partition may not interfere with its easement for right of way, roadway and light and air over lot 6A. In response to an inquiry by this court, appellant's attorney has advised us that the partition action has no bearing on this case, that it is "at issue," but that no trial date has been set. (Letter from Attorney Stanley Dupree Feb. 20, 1986.)

[7]At the outset we note "that the rules applying to the construction of statutes apply equally to ordinances. [Citation.]" (*County of Madera* v. *Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283].) All parties to this appeal agree, as does the court, that under the charter and ordinances of the city, a resolution of the planning commission such as that here in issue has the same force and effect as an ordinance. (See San Francisco Planning Code, § 174.)

agency charged with enforcing it is entitled to great weight and should be followed unless clearly wrong. (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564]; *Standard Oil Co.* v. *Feldstein* (1980) 105 Cal.App.3d 590, 602 and fn. 15 [164 Cal.Rptr. 403].) Nevertheless, the ultimate interpretation of the resolution is a question of law. We are bound neither by the interpretation of the lower court nor by the construction given the resolution by the City. (*Ibid.; County of Madera* v. *Superior Court, supra,* 39 Cal.App.3d 665, 668; Evid. Code, § 310.)

■ "In construing the statutory language the primal principle of statutory construction requires the ascertainment of the intent of the legislative body (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 . . .), this court having no power to rewrite an ordinance or statute so as to make it conform to a presumed intention which is not expressed. [Citation.]" (*County of Madera* v. *Superior Court, supra,* at p. 668.)

■ "'An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them.' (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 . . .; *Moyer* v. *Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d at p. 230.) Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature. (*People* v. *Knowles* (1950) 35 Cal.2d 175, 182 . . .; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 . . . .) 'If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' (*People* v. *Knowles, supra,* 35 Cal.2d, at p. 183; *Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d, at p. 604.)" (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

Turning to condition 5 of the resolution, it seems straightforward and unambiguous. It requires Five Fremont to develop a mid-block pedestrianway connecting Market and Mission Streets, and linked to a proposed pedestrian bridge. Until the bridge is constructed, the pedestrianway is to terminate within the Five Fremont Center development and pedestrian access to the North sidewalk of Mission Street mid-block shall be prohibited "by an appropriate design treatment." The resolution *specifically* states: "the pedestrianway shall be of adequate, comfortable dimensions, *at least 12 feet in width,* and shall feature such amenities as will encourage use of this

pedestrianway as an alternative to First and/or Fremont Street sidewalks." (Italics added.) As amended by the board of permit appeals, the resolution also provides that lot 6A is not to be used for the pedestrianway without TPC's consent, except as Five Fremont's easement rights permit.

Nothing in the language of the resolution suggests that the pedestrianway need only be four and one-half feet or that Five Fremont may satisfy its obligation to construct a twelve-foot pedestrianway linking Market and Mission Streets by offering to the City its four-and-one-half-foot side strip plus its undivided interest in lot 6A. Nor do the terms of the resolution suggest that the pedestrianway condition is contingent upon actual future construction of the proposed pedestrian bridge. Indeed, the reference to prohibition of pedestrian access to Mission Street mid-block implies that construction of the entire pedestrianway was to be undertaken as part of the construction of the Five Fremont project.

Respondents urge this court to consider the declarations of various City officials and members of the planning commission and board of permit appeals. Our preliminary review of this extrinsic evidence[8] satisfies us that to the extent the declarations state the declarants' understanding and personal opinion as to the meaning of the pedestrianway condition, they may not be employed by us in determining the meaning of the language of the resolution here in issue. (*California Teachers Assn.* v. *San Diego Community College Dist., supra,* pp. 692, 701.)

*California Teachers Assn., supra,* held that a declaration by the author of legislation sent to the Governor, which outlined the intent of the Legislature and urged the Governor to sign it, was "not a proper subject for consideration in determining the Legislature's intent. . . ." (*Id.*, at p. 701.) The court reasoned that the statement revealed only the author's personal opinion and understanding of the legislation. (*Ibid.;* see also *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 618-619 [194 Cal.Rptr. 294].)

Respondents point out that appellant agreed to allow the trial court to consider these declarations, arguing that appellant "invited error" in this respect.

[8]As noted in *California Teachers Assn.* v. *San Diego Community College Dist., supra,* 28 Cal.3d 692, "a court must make an initial review of the evidence in order to determine whether it is entitled to be considered on the question of determining the Legislature's intent. (Cf. *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-40 . . ., *Estate of Russell* (1968) 69 Cal.2d 200, 207 . . . .)" (28 Cal.3d at p. 700, fn. 4.)

"The interpretation of a statute [or ordinance], however, is a question of law, and we are not bound by evidence presented on the question in the trial court. [Citations.] The propriety of the use of extrinsic materials in determining legislative intent is a question which may properly be considered on appeal regardless of whether the issue was raised in the trial court." (*California Teachers Assn.* v. *San Diego Community College Dist.*, *supra,* 28 Cal.3d at p. 699.) We believe the same principle operates here, where appellant agreed to use of the declarations, as in *California Teachers Assn.*, where the district failed to object below to use of the statement.

We therefore disregard the proffered declarations to the extent they purport to offer the declarants' opinions, understandings, and interpretations of the resolution at issue. Certain of the declarations contain narratives of "discussions and events leading to adoption" of the resolution and its amendment. Where such is the case, we have considered them. (*California Teachers Assn.* v. *San Diego Community College Dist., supra,* 28 Cal.3d 692, 700.)[9]

"It has been called a golden rule of statutory interpretation that unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result" (2A Sutherland, Statutory Construction (4th ed.) § 45.12, p. 54, fn. omitted). (See *Armstrong* v. *County of San Mateo, supra,* 146 Cal.App.3d 597, 615; *Silver* v. *Brown* (1966) 63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689] ["[t]he literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole. [Citations.]"].) We remain unconvinced that the resolution at issue is ambiguous, and we hesitate to explore the asserted "realities" which respondents claim lead to absurd results when we interpret the resolution in accordance with its plain meaning.

Respondents point out the following:

[9]"A legislator's statement is entitled to consideration, however, when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion. (*Id.*, at p. 590; *Friends of Mammoth* v. *Board of Supervisors* [1972] 8 Cal.3d [247] at p. 284 [104 Cal.Rptr. 761, 502 P.2d 1049] (dis. opn. by Sullivan, J.); *Rich* v. *State Board of Optometry, supra,* 235 Cal.App.2d, at p. 603 . . .; see also *Stanton* v. *Panish* (1980) 28 Cal.3d 107, 114 . . . [declaration of chairman of Cal. Const. Revision Com. considered insofar as it chronicled events leading to proposed amendment].)" (*Ibid.*)

(1) The planning commission and the board of permit appeals were aware that, given the project's design layout, there was no room on lot 7 for a 12-foot wide pedestrianway without substantial modifications to the tower;

(2) Both entities approved the plan, including the tower location;

(3) The EIR stated that Five Fremont had rejected alternative methods of meeting the pedestrianway requirement by running it through the tower itself;

(4) Both entities knew that lot 6A could not be used for the pedestrianway without the consent of TPC;

(5) All parties were aware that the pedestrian bridge might never be built. With this in mind, the resolution required Five Fremont to incorporate in its design a barrier to through pedestrian traffic to Mission Street in order to discourage jaywalkers on Mission.

These facts do support respondents' interpretation. In light of these asserted realities, it would have been reasonable to expect the commission and the board to adopt a resolution providing that Five Fremont need not build the pedestrianway, but need only grant to the City its rights in 6A or that it need only build a 44-foot wide way at its southern end, or that its duty to provide the pedestrianway was contingent upon the actual construction of a pedestrian bridge at a future date. No such resolution was adopted and no such clarification in resolution 8877 was ever made. The resolution, as adopted and as amended continued to require development of a 12-foot pedestrianway. The City certainly could have clarified that they were not requiring a 12-foot pedestrianway by language in the resolution or its amendment, and they did not do so. The resolution, as drafted, as adopted, and as amended *is clear and unambiguous* on this point.

The City itself created the problems it now says do not exist and that it attempts to interpret away. This it did to the detriment of TPC, which was left with an unresolved dilemma. Assured by the amendment that its rights in lot 6A were to be respected, TPC was at the same time aware that the terms of the resolution still required Five Fremont to develop the pedestrianway and that Five Fremont had rejected alternatives other than utilization of lot 6A. Clearly, TPC's fear of an eminent domain action by the City to enable Five Fremont to meet its obligation is solidly grounded. The public also is misled by the language of the resolution. On the one hand the resolution appears to insure that Five Fremont will develop a pedestrianway to help mitigate the increased pedestrian traffic generated by the Five Fre-

mont project. On the other hand, the City's interpretation of its resolution suggests that the pedestrianway will never be built or that, if it is built, it will be at public expense following an eminent domain action.

II.

*Whether the Zoning Administrator Has Discretion to Interpret the Resolution as Contended by Respondents*

"While mandamus will not lie to control the exercise of discretion, the writ is available to correct abuse of discretion. [Citation.]" (*Pacific etc. Conference of United Methodist Church* v. *Superior Court* (1978) 82 Cal.App.3d 72, 81 [147 Cal.Rptr. 44].) The traditional mandamus provisions of Code of Civil Procedure section 1085 may be employed to compel the performance of a duty which is purely ministerial in character; but they cannot be applied to control discretion as to a matter lawfully entrusted to the City. (*State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 247 [115 Cal.Rptr. 497, 524 P.2d 1281], and cases there cited; *Harbach* v. *El Pueblo de Los Angeles etc. Com.* (1971) 14 Cal.App.3d 828, 833 [92 Cal.Rptr. 757].)

Respondents argue that the zoning administrator has discretion to determine whether condition 5 of the resolution has been violated. In essence, they argue that the zoning administrator has discretion to interpret condition 5. In this instance, in light of the clear language of the condition with respect to the pedestrianway requirement, we conclude that the zoning administrator has no discretion but rather a ministerial duty to enforce the condition set forth in the resolution.

The parties have cited numerous cases discussing the ministerial versus discretionary duties of various authorities and administrative agencies. No cited case specifically discusses the authority of a zoning administrator. We believe that *Harbach* v. *El Pueblo de Los Angeles etc. Com., supra,* 14 Cal.App.3d 828 is the case most analogous and, therefore, most instructive on this point.

In *Harbach,* a historical monument commission created by the City of Los Angeles adopted a resolution agreeing to relocate and restore a building known as Rochester House. However, the commission failed to implement the original resolution and petitioners sought by writ of mandate to compel the commission to fulfill its obligations under the original resolution. The commission argued that "no writ of mandate may issue to compel it to perform a discretionary act, or to perform any act which it has no legal

duty to perform." (*Id.*, at p. 833.) Looking to the act authorizing the commission, the court held that although the commission had discretion in the first instance to approve or disapprove the resolution, once that resolution had been approved, and while it was still in full force and effect, the commission had a ministerial obligation to enforce it. The court drew an analogy between the commission and the actions of a city council.

"A close analogy with the function of the city council can be drawn. When the city council votes for an ordinance, the councilmen are exercising their discretion in voting. *If the necessary majority vote in favor of the ordinance, the various city departments are charged with the ministerial task of implementing the ordinance.* Since the Commission does not have other departments to implement the resolution, it is the legal duty of the Commission through its executive officers to implement all duly passed resolutions. The Commission's function is now purely ministerial. Mandate will issue to compel a public body to perform a ministerial act. (Code Civ. Proc., § 1085; see, *San Bernardino Fire & Police Protective League* v. *City of San Bernardino,* 199 Cal.App.2d 401, 417 . . . .) [Italics added.] [¶] As stated, Resolution No. 176 was passed unanimously by the Commission, with one absention; it has never been rescinded or modified, and remains in full force and effect. The individual members of the Commission have thereby exercised their discretion in deciding to relocate the Rochester House, and now it is the ministerial task of the Commission to implement the resolution. The Commission's duty remains until the resolution is effectively implemented, or the members of the Commission again exercise their discretion by the necessary two-thirds vote of those present to rescind or modify the resolution." (*Id.*, at p. 834.)[10]

This analysis is in accordance with *Great Western Sav. & Loan Assn.* v. *City of Los Angeles* (1973) 31 Cal.App.3d 403 [107 Cal.Rptr. 359], where the court upheld the trial court's issuance of the writ compelling the city to approve a final tract map. The court rejected the city's argument that the city council could refuse to approve a final tract map where the developer had complied with all applicable state and local laws and with conditions of the tentative map. (*Id.*, at pp. 408-413.) The court concluded that in the case before it the functions of the city council were administrative and ministerial. (*Id.*, at p. 413.) "Where a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of

[10]The court then stated that the commission would be barred from a discretionary act to rescind or modify the resolution because of "intervening events and the substantial reliance (evidenced by donations) by approximately 1,500 people on the Commission's prior course of conduct . . . ." (*Ibid.*)

discretion. [Citations.]" (*Ibid.*) In such case, the functions of the officer are ministerial and the writ may be issued to control his action. (*Ibid.*)

The cases cited by respondents in support of their contention that the zoning administrator has discretion to interpret the resolution and to enforce it are easily distinguishable. Each of these cases turns upon the court's view of the statute or ordinance empowering the authority to act. (E.g., *Blankenship* v. *Michalski* (1957) 155 Cal.App.2d 672 [318 P.2d 727]; *King* v. *Berkeley Unified School Dist.* (1979) 89 Cal.App.3d 1016 [152 Cal.Rptr. 782]; *Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303 [144 P.2d 4]; *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317 [253 P.2d 659].) In some cases the court found the statute or ordinance explicitly or by implication gave the authority discretion with respect to the matter at issue. (See *Lindell, supra, King, supra.*) In others, the statute or ordinance in question was amenable to the interpretation given by the administrative authority and the petitioners had not shown that the authority had failed to perform any duty required by the statute or ordinance. (E.g., *Faulkner, supra, Blankenship, supra.*)[11]

Here, in contrast, the resolution is clear and, as we previously concluded, it is not amenable to the strained interpretation urged by respondents. Moreover, we do not read the Planning Code as granting the zoning administrator the discretion claimed in this case. Respondent City points to various sections

[11]Respondents particularly rely upon *Blankenship* v. *Michalski, supra,* 155 Cal.App.2d 672 [318 P.2d 727]. As described by Five Fremont, "There, the petitioner sought a writ of mandate to require the city attorney to enforce a zoning ordinance against an alleged violator which operated a pharmacy in a medical clinic. The applicable zoning law specifically prohibited the operation of drugstores, but allowed the operation of '"necessary service facilities * * * in connection with schools, colleges, hospitals, and other institutions when located on the site of the principal use"' (155 Cal.App.2d 673). . . . there was even a special ordinance which explicitly provided that the city attorney '"shall immediately commence action"' (155 Cal.App.2d 675) to prevent any proscribed use of property. Affirming denial of the writ, the court declared: 'Certainly, someone, in the first instance, must determine whether a proposed use will violate the ordinance. This requires an analysis of the facts and an interpretation of the ordinance. The responsibility of determining this question, in the first instance, is placed on the city attorney. He necessarily must have some discretion. Certainly, if he, in good faith, determines that no violation has occurred, he should not be compelled to institute abatement proceedings at the whim or caprice of every taxpayer who disagrees with him' (155 Cal.App.2d 675)." However, respondents fail to mention that the *Blankenship* court also concluded that the violation of the ordinance was *not* clear and obvious. It stated, "Here, to say the least, it is reasonably debatable whether a violation has occurred. In such a situation the determination of the city attorney that no violation had occurred was well within his discretion, and should not be controlled by mandamus." (*Id.*, at p. 676.)

of the City Planning Code set forth in the margin below,[12] as embodying the grant of discretion to the zoning administrator. (City Planning Code, §§ 176(b), 303(d) and 307.)

[12]"Sec. 176. Enforcement Against Violations. (a) *Violations unlawful.* Any use, structure, lot, feature or condition in violation of this Code is hereby found and declared to be unlawful and a public nuisance. Should any permit or license have been issued that was not then in conformity with the provisions of this Code, such permit or license shall be null and void.

"(b) *Methods of enforcement.* The Zoning Administrator shall have authority to enforce this Code against violations thereof by any of the following actions:

"1. Serving notice requiring the cessation, removal or correction of any violation of this Code upon the owner, agent or tenant of the property that is the subject of the violation, or upon the architect, builder, contractor or other person who commits or assists in such violation;

"2. Calling upon the City Attorney to maintain an action for injunction to restrain or abatement to cause the correction or removal of any such violation, and for assessment and recovery of a civil penalty for such violation;

"3. Calling upon the District Attorney to institute criminal proceedings in enforcement of this Code against any such violation; and

"4. Calling upon the Chief of Police and authorized agents to assist in the enforcement of this Code.

"Sec. 303. Conditional Uses. (a) *General.* The City Planning Commission shall hear and make determinations regarding applications for the authorization of conditional uses in the specific situations in which such authorization is provided for elsewhere in this Code.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) *Determination.* After its hearing on the application, the City Planning Commission may approve the application and authorize a conditional use if the facts presented are such as to establish:

"1. That the proposed use or feature, at the size and intensity contemplated and at the proposed location, will provide a development that is necessary or desirable for, and compatible with, the neighborhood or the community; and

"2. That such use or feature as proposed will not be detrimental to the health, safety, convenience or general welfare of persons residing or working in the vicinity, or injurious to property, improvements or potential development in the vicinity, . . .

"(d) *Conditions.* When authorizing a conditional use as provided herein the City Planning Commission, or the Board of Supervisors on appeal, shall prescribe such additional conditions, beyond those specified in this Code, as are in its opinion necessary to secure the objectives of the Code. Once any portion of the conditional use authorization is utilized, all such conditions pertaining to such authorization shall become immediately operative. The violation of any condition so imposed shall constitute a violation of this Code and may constitute grounds for revocation of the conditional use authorization. Such conditions may include time limits for exercise of the conditional use authorization; otherwise, any exercise of such authorization must commence within a reasonable time. . . .

"Sec. 307. Other Powers and Duties of the Zoning Administrator. In addition to those specified in Sections 302 through 306, the Zoning Administrator shall have the following powers and duties in administration and enforcement of this Code. The duties described in this section shall be performed under the general supervision of the Director of Planning, who shall be kept informed of the actions of the Zoning Administrator.

"(a) *Rules, regulations and interpretations.* The *Zoning Administrator shall,* consistent with the expressed standards, purposes and intent of this Code and pursuant to its objectives, *issue and adopt* such rules, regulations and *interpretations* as are in the Zoning Administrator's opinion necessary to administer and enforce the provisions of this Code . . . . [Italics added.]

"(b) *Compliance with this Code.* The Zoning Administrator shall have authority to take appropriate actions to secure compliance with this Code, through review of permit applications, surveys and record keeping, enforcement against violations as described in Section 176, and other means."

In the main, and when read in context, these sections do not sweep so broadly as respondents claim. Section 307, which does authorize the zoning administrator to exercise discretion in some areas and charges him with the duty to enforce the code, directs him to adopt rules, regulations and interpretations which he determines are necessary to administer the code. However, these must be "*consistent with the expressed standards, purposes and intent of this Code and pursuant to its objectives.*" (§ 307(a), italics added.)

While the zoning administrator may have discretion in a wide range of technical areas to carry out the intent of the code, particularly with respect to issues such as variances and conditional use permits, we find it inconceivable that he has the power to countermand particular conditions explicitly imposed upon a development project by the commission and approved by the board of permit appeals, such as are embodied in resolution 8877. There is no room for the zoning administrator to interpret the resolution contrary to its express terms, and we do not read these code sections so broadly as to grant to the zoning administrator this remarkable authority. That the administrator may choose among various enforcement mechanisms to secure compliance with the code, does not grant him authority to ignore the express requirement of the condition adopted by the commission. This is particularly the case where the condition is for the public benefit.

The same considerations pertain to the City's contention that the zoning administrator has "prosecutorial discretion." The City argues that the zoning administrator may refuse to enforce the resolution in the face of a violation in the same way that a district attorney may refuse to prosecute a violation. Drawing primarily from district attorney cases,[13] the City asserts that these decisions imply that "administrative officers charged with the duty of enforcing the law are vested with prosecutorial discretion" and that the "Zoning Administrator has discretion in determining what code violations warrant enforcement action."[14]

[13]*Taliaferro* v. *City of San Pablo* (1960) 187 Cal.App.2d 153 [9 Cal.Rptr. 445]; *People* v. *Vatelli* (1971) 15 Cal.App.3d 54 [92 Cal.Rptr. 763]; *Ascherman* v. *Bales* (1969) 273 Cal.App.2d 707 [78 Cal.Rptr. 445].)

[14]City cites to Ninth Circuit cases for the general proposition that "[w]here the established facts empower an administrative agency to take particular remedial action, the determination of whether it should take that action rests within the sound discretion of the agency." (*San Francisco Mining Exch.* v. *Securities & Exchange Com'n.* (9th Cir. 1967) 378 F.2d 162, 165, fn. omitted. See *California Airmotive Corporation* v. *Bass* (9th Cir. 1965) 354 F.2d 453, 455.)

We are unpersuaded that these federal cases regarding SEC powers and jurisdiction of the United States Bankruptcy Court are pertinent to the issue at hand.

City argues that the "Zoning Administrator must determine, within the limited resources available to him, which violations of the City Planning Code must be enforced and which, in his opinion, do not warrant enforcement because the health, safety, and welfare of the public is not threatened."

However, again we have been cited to no case granting such broad prosecutorial discretion to a zoning administrator. We remain unconvinced that cases upholding the right of a district attorney to exercise his sound discretion in the selection of criminal cases to prosecute are analogous. Here, the zoning administrator operates within the planning department and under the supervision of the director of planning. Both the planning director and the zoning administrator are answerable to the planning commission and must insure that its directives and decisions are carried out. This appears to us fundamentally distinct from the position, the duties and the necessary independence of a district attorney. The theory that a zoning administrator may ignore and not enforce requirements of specific resolutions of the commission conditioning development of major construction projects seems to us qualitatively very different from and not supported by the fact that a zoning administrator may choose not to pursue a nonconforming use or a minor nuisance.[15] If we were to accept respondents' theory we would make a mockery of the planning commission and the entire planning process.

We conclude that the zoning administrator has a ministerial duty to enforce the clear requirements of the pedestrianway condition imposed by the commission.

III.

*Whether the Duty to Construct the Pedestrianway Is Contingent Upon the Eventual Development of the Pedestrian Bridge*

Five Fremont argues that the writ will not lie in this case as the pedestrianway obligation is a future obligation, contingent upon construction of the pedestrian bridge.

As a rule, a writ of mandamus will issue to compel the performance of a clear and *present* duty. "[T]he writ will not be granted merely in anticipation that the party will refuse to perform the duty when the time comes [citations]." (*Brandt* v. *Board of Supervisors* (1978) 84 Cal.App.3d

[15]We do not mean to say that the zoning administrator may refuse to prosecute these latter "minor" nuisances. That case is not before us. However, were we convinced that the zoning administrator possessed such limited prosecutorial discretion, we would not extend it to permit circumvention of the type of planning commission resolution at issue here.

598, 601 [147 Cal.Rptr. 468]; see, e.g., *Berkeley Sch. Dist.* v. *City of Berkeley* (1956) 141 Cal.App.2d 841, 845 [297 P.2d 710].)

Five Fremont points to the portion of condition 5 requiring it to prevent mid-block pedestrian access to Mission Street until such time as the bridge may be built as evidence that a future obligation is contemplated. We do not think this language can tenably be construed to relieve Five Fremont of its present duty to provide for the pedestrianway, and to do so without utilizing lot 6A or interfering with TPC's rights in lot 6A absent TPC's consent.

At a minimum, requiring Five Fremont to close Mission Street access indicates Five Fremont had and has a present duty to incorporate the pedestrianway into its plans; a duty it still has not discharged.[16] Inexplicably, City permitted Five Fremont to proceed with development of the project without making any provision for a pedestrianway in the manner specified by condition 5. Now, five years after the condition was imposed, respondents complain about the harm and huge expense belated compliance would entail; providing graphic illustration of the perils of failing promptly to enforce the resolution as written or, if the commission did not intend the resolution to mean what it clearly says, to modify or amend it.

The resolution imposed a *present* obligation on Five Fremont to design and build a midblock pedestrianway of at least 12 feet in width and to do so without interfering with TPC's easement rights in lot 6A.

A writ of mandamus may issue to enforce such present duty, regardless of the fact that the pedestrian bridge is not yet in place and regardless of speculation as to when or whether it shall be built.

## IV.

### *Attorneys' Fees*

Appellant contends that it is entitled to attorneys' fees should this court reverse the trial court's denial of the writ. It bases its claim upon the "substantial benefit" theory, a nonstatutory equitable doctrine, and the

[16] Although Five Fremont asserts in its brief that it has adopted "three design concepts" to accommodate a bridge, each evidently assumes use of lot 6A.

"private attorney general" theory, embodied in Code of Civil Procedure section 1021.5.[17] We disagree.

As a preliminary matter, we point out that were we persuaded that an attorneys' fee award on either theory were possible, we would do no more than remand to the trial court to enable it to exercise its discretion as to whether the statutory requisites were met by appellant. (*Marini* v. *Municipal Court* (1979) 99 Cal.App.3d 829, 836 [160 Cal.Rptr. 465].) Because we are convinced that neither theory is appropriate in this case, we proceed to discuss the merits.

"Because of the disparity in the purpose underlying the private attorney general and substantial benefit doctrines, the doctrines differ in a number of subtle but important respects . . . [W]hereas the private attorney general doctrine as embodied in section 1021.5 (and most comparable statutory provisions) provides for the shifting of attorney fees from plaintiffs to 'one or more opposing parties,' the substantial benefit doctrine does not contemplate that the losing party or parties should ultimately bear attorney fees but rather mandates that '*those receiving the benefits* should contribute to the costs of its production.' (Italics added.) (*Serrano III, supra,* [*Serrano* v. *Priest* (1977) 20 Cal.3d 25] at p. 38.)" (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 943 [154 Cal.Rptr. 503, 593 P.2d 200].)

The private attorney general theory as defined in Code of Civil Procedure section 1021.5 "is clearly designed to encourage private enforcement of important public rights [citations]: true public-interest litigation conducted by protagonists who are truly private attorneys general. Each of the three pivotal elements of California's private attorney general theory directly implements the general requirement that the benefit provided by the protagonist's action must inure primarily to the *public* and be *substantial* in a doctrinal if not a material sense: [¶] (1) The public right which the private protagonist invokes must be *important* . . . . [¶] (2) The benefit which the action confers must be *significant* and must inure to *the general public or a large class of persons:* Again, the trial court must 'determine the signif-

[17]That section provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

icance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case' (*Woodland Hills, supra,* 23 Cal.3d at pp. 939-940). [¶] (3) The necessity and financial burden of *private* enforcement must be 'such as to make the award appropriate.' It is not enough that the protagonist has limited financial resources: 'An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter."' (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 . . ., citing *Serrano III, supra,* 20 Cal.3d at pp. 45-46, fn. 18, and quoted in *Woodland Hills, supra,* 23 Cal.3d at p. 941.)" (*Marini* v. *Municipal Court, supra,* at pp. 835-836, italics in original.)

We need not assess the presence or absence of a substantial public benefit in this case because we do not think TPC was primarily motivated to bring and maintain this action by the desire to vindicate any interest of the public. TPC clearly was attempting by this litigation to protect its rights in lot 6A. TPC itself has characterized its economic stake in the outcome as "substantial." We cannot conclude that the cost transcends appellant's personal interest or that the burden of pursuing this action has been "'"out of proportion to his individual stake in the matter."' [Citations.]" (*Marini, supra,* at p. 836.)

Further, we have similarly concluded that attorneys fees may not be recovered here under the "substantial benefit" theory. As described in *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d 917, 943: "Unlike the private attorney general concept, which . . . is intended to promote the vindication of important rights affecting the public interest, the 'substantial benefit' doctrine—like the 'common fund' doctrine from which it emerged—rests on the principle that those who have been 'unjustly enriched' at another's expense should under some circumstances bear their fair share of the costs entailed in producing the benefits they have obtained." We are aware, of course, that there have been "instances in which litigation has produced nonpecuniary benefits of such a concrete and clearly substantial value that equitable considerations have suggested the injustice in permitting others to obtain such benefits without contributing to their cost. [Citation.]" (*Woodland Hills, supra,* at p. 946.) We see no such "unjust enrichment" in this case. As we have discussed, TPC's stake in this litigation was substantial. The public benefit, though one may have resulted, is considerably less "concrete."

Appellant contends that its action will have "prevented the illegal expenditure of public funds by the City in condemning Terminal Plaza's interest in Lot 6A," producing a substantial public benefit. However, we have not in this decision addressed a condemnation issue. So far as we are aware, the City has not initiated any condemnation action at present and we have not by our decision today ruled on the propriety of any such action in the future. Thus, appellant's contention that it has saved the public monies from waste and illegal expenditure must fail. We therefore conclude that appellant is not entitled to attorneys' fees in this action.

The judgment is reversed and the trial court is directed to issue a writ of mandate commanding respondent City to enforce the conditions of Five Fremont Center's site permit and resolution 8877 by requiring Five Fremont to immediately construct the contemplated pedestrianway without the use of lot 6A, except as may be permitted under the existing easement rights held by Five Fremont.

Costs to plaintiff Terminal Plaza as prevailing party.

Rouse, J., and Smith, J., concurred.

Petitions for a rehearing were denied October 21, 1986, and the petitions of all respondents for review by the Supreme Court were denied December 17, 1986.