[No. A059528. First Dist., Div. Two. Dec. 8, 1993.]

BAYSIDE AUTO AND TRUCK SALES, INC., Plaintiff and Appellant, v. DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.

**COUNSEL**

Eisenberg, Axelrod & Highlander, Neil D. Eisenberg and Lynn L. Axelrod for Plaintiff and Appellant.

William M. McMillan, Daniel C. Murphy, Thomas Lacchia and Ronald W. Rogers for Defendant and Respondent.

## OPINION

**SMITH, Acting P. J.**—Bayside Auto and Truck Sales, Inc. (Bayside) appeals from an order denying its petition for writ of mandate to compel the California Department of Transportation (Caltrans) to offer it for sale real property in San Francisco which it has leased from the state since 1973. The main contention here, as below, is that Caltrans had a mandatory duty to offer Bayside the land for sale as excess property under section 118 et seq. of the Streets and Highways Code (all further section references are to that code unless noted otherwise) and Caltrans regulations. We affirm the judgment.[1]

Bayside has run an auto wrecking business on the subject property, 1900 Evans Avenue in San Francisco, since 1973—since July of 1975 under a series of leases with Caltrans. First acquired by condemnation in 1965 for a highway interchange project along I-230 between I-280 and I-101, the property ceased to be needed for that purpose when the project was rescinded by resolution of the California Highway Commission (now California Transportation Commission [commission]), in October 1976. The resolution authorized Caltrans to dispose of previously acquired rights of way along that route.

The point of contention here is that the property was never offered for sale to Bayside. Rather, it was placed in administrative hold categories, first at the urging of the city, which expressed ongoing interest in an alternative project, and eventually for just such a project, the Islais Creek Interchange Project on I-280, formally adopted by the commission in 1986.

Bayside began inquiring of Caltrans in early 1989 about the prospect of buying the property as excess land. This came in conjunction with rent increases and other lease-related disputes arising around the same time. Caltrans did not declare the property available for sale as excess property, however, and renewed its hold.

Bayside eventually filed this mandate action in May 1992, claiming that Caltrans had a duty to offer it the property beginning in 1976 and that the property must now be offered at its fair market value as of 1976. Bayside claimed noncompliance with sections of the statute (§§ 118.1, 118.6) and

---

[1]Bayside also sued for relief based solely on its rights as lessee (i.e., beyond any purchase rights), but the superior court severed the mandate issue for immediate resolution. Caltrans moved to dismiss this appeal as taken in violation of the one-final-judgment rule, but we denied the motion (*Garat* v. *City of Riverside* (1991) 2 Cal.App.4th 259, 276 [3 Cal.Rptr.2d 504]; *Day* v. *Papadakis* (1991) 231 Cal.App.3d 503, 512 [282 Cal.Rptr. 548]).

Caltrans's implementing "Right of Way Procedure Handbook" (Handbook). It also claimed infringement of its "constitutional right to due process."

The matter came before Superior Court Judge Stuart R. Pollak, who denied the petition. His August 31, 1992, order and statement of decision recites that Bayside failed to establish that the land "is not currently being held" in compliance with the Handbook. A current hold of December 24, 1991, appeared to "substantially satisfy" the Handbook "so that [Caltrans] need not offer to sell the property in question at this time[,]" and there was accordingly "no need to evaluate the sufficiency of the documentation for prior years."

I

The court obviously focused on the requirement for mandate that there be a clear, *present* and usually ministerial duty on the part of the respondent. (*Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 863 [132 Cal.Rptr. 464, 553 P.2d 624]; *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 186 Cal.App.3d 814, 835 [230 Cal.Rptr. 875]; Code Civ. Proc., § 1085.) It correctly reasoned that if Caltrans had a valid hold on the property by the time the petition was filed in May 1992 and that hold remained in effect, there was no *present* duty to offer the property to Bayside for sale, regardless of deficiencies in preceding years. Bayside seeks to avoid that result by arguing that (1) noncompliance in previous years had the effect of invalidating the current hold examined by the court, (2) the court should have insisted on strict, not substantial compliance, (3) there was no substantial compliance, and (4) an abandonment of the proposed Islais Creek Interchange Project announced by the city shortly before judgment undermined the current hold. We examine the issues in that sequence.

*Invalidation by prior noncompliance*

Bayside urges that because sections 118.1 and 118.6 state in mandatory language that property "shall" be offered to a current lessee within one year of being declared excess land and because such provisions benefit a lessee, violations of the code or the Handbook regulations which implement it result in later holds being invalid. We are not persuaded.

The principle at work here is well settled. "[A] 'mandatory-directory' distinction is used to determine whether action taken in violation of a statutory provision is valid. Failure to comply with a mandatory provision renders the action void; failure to comply with a merely directory provision does not. Which way to characterize [a] provision depends on its importance

in the legislative scheme. [Citations.]" *(Myers* v. *Patterson* (1987) 196 Cal.App.3d 130, 135 [241 Cal.Rptr. 751].) At the same time, not every provision which is "mandatory" in the sense of being obligatory has invalidating effect. "The 'mandatory-directory' test used to determine validity is analytically distinct from the 'mandatory-permissive' test used to determine the nature of duty. [Citations.] The tests are related in the sense that procedures which are purely permissive in the sense of duty are generally regarded as directory and thus not invalidating. 'The converse of this proposition is not always true, however, for . . . "[m]any statutory provisions which are 'mandatory' in the obligatory sense are accorded only 'directory' effect." [Citation.]' [Citation.]" *(Id.,* at p. 136.)

 Addressing first the code sections, as opposed to the regulations, we find no mandatory provision to declare property excess, even in the duty sense. Both parties focus on sections 118.1 and 118.6, ignoring the key provision, section 118, which dates back to the enactment of the Streets and Highways Code in 1935. (Stats. 1935, Ex. Sess. 1934, ch. 29, § 118, p. 258.) That section provides that "[w]henever" Caltrans "determines" that property "is no longer necessary" for highway purposes, it "may" sell or exchange it. (§ 118, subd. (a).) Those are words of discretionary, not ministerial action. Generally, " 'Shall' is mandatory and 'may' is permissive" under the code. (§§ 16, 5.) Provisions that sale proceeds and exchanged property are to be used for highway purposes show a legislative purpose to keep resources available for state highway needs, connoting discretionary management decisions. (§ 118, subds. (b) and (c).)[2]

It is in that context that sections 118.1 and 118.6, enacted in 1981 and 1972 respectively (Stats. 1981, ch. 851, § 1, pp. 3271-3272; Stats. 1972, ch. 1331, § 1, pp. 2663-2664), employ the word "shall" relied on by Bayside. Once commercial property *is* determined to be "no longer required" for highway purposes, Caltrans "shall first offer" it for sale at its current fair

---

[2]*Section 118.* "(a) Whenever the department determines that any real property or interest therein, previously or hereafter acquired by the state for highway purposes, is no longer necessary for those purposes, the department may sell, contract to sell, sell by trust deed, or exchange the real property or interest therein in the manner and upon terms, standards, and conditions established by the commission. . . .

" . . . . . . . . . . . . . . . . . . . . . . . .

"(b) Any conveyance under this section shall be approved by the commission and shall be executed on behalf of the state by the director and the purchase price shall be paid into the State Treasury to the credit of any fund, available to the department for highway purposes, which the commission designates.

"(c) Any such real property or interest therein may in like manner be exchanged, either as whole or part consideration, for any other real property or interest therein needed for state highway purposes."

market value to an occupant who has made over $5,000 in improvements. (§ 118.1.) Caltrans "shall, to the greatest extent possible, offer to sell . . . within one year from the date that it is determined . . . to be excess." (§ 118.6.)[3]

In short, however we might characterize the duties flowing from the "shall" language in sections 118.1 and 118.6, those duties arise only *after* Caltrans has made a discretionary determination that property once acquired or held for highway purposes is now "excess," that is, no longer needed for those purposes (§ 118.6; fn. 3, *ante*). Because Caltrans never made that discretionary determination in this case, it never had a duty under the code sections to offer the leased property to Bayside, at any particular time or price. This obviates any need to ponder the timing quirk posed by the fact that Bayside sought the property at its 1976 fair market value while section 118.1, the claimed source of Caltrans's duty to "first offer" it to Bayside as an occupant lessee improver, did not go into effect until 1982.

Bayside also tries to read invalidating mandatory provisions into the Handbook regulations. The regulations, in Bayside's view, construct a sort of default system where land along rescinded routes becomes immediately available for sale unless timely placed in one or more hold categories; failure

---

[3]*Section 118.1.* "Except as provided in Article 8 (commencing with Section 54220) of Chapter 5 of Part 1 of Division 2 of Title 5 of the Government Code and Section 118.6 of this code, with respect to commercial real property acquired for the construction of a state highway, but no longer required for that purpose because the construction will not be undertaken, the department shall first offer the real property for sale at its current fair market value to the occupant thereof if the occupant is renting or leasing the real property from the department, has used and occupied the real property, and has made improvements of a value in excess of five thousand dollars ($5,000) on the real property during that time at his or her own expense consistent with the terms of the rental or lease agreement with the department. . . .

"The failure of the department to first offer excess real property as required by this section shall not affect the validity of any conveyance of this excess real property to any person or entity unaware of the failure of the department to do so. However, this shall in no way be construed as releasing the department from its responsibility in offering that property to the occupants thereof first."

*Section 118.6.* "The department shall, to the greatest extent possible, offer to sell or exchange excess real property within one year from the date that it is determined by the department to be excess.

" 'Excess real property,' for the purposes of this section, means all land and improvements situated outside of calculated highway right-of-way lines not needed or used for highway or other public purposes, including, but not limited to, those leased to public agencies pursuant to Section 104.15, and available for sale or exchange.

"The department shall adopt rules and regulations to determine which real property outside of calculated right-of-way lines is no longer needed or used for highway or other public purposes, and which is available for sale or exchange.

" . . . . . . . . . . . . . . . . . . . . . . . . ."

to comply with the Handbook's hold procedures results in continued excess land status and triggers a duty to offer the property for sale to an occupant lessee improver. Any later effort to place a hold is, in its view, invalid. Without passing on the merits of Bayside's regulatory construction, we hold that even such a construction would not render subsequent holds invalid.

Bayside cites no authority holding that noncompliance with a regulation, as opposed to a statutory provision, results in later agency action being invalid. It would be incongruous to hold that an agency, in the process of implementing a statute which is merely directory, could create invalidating mandatory regulations. We know of no such authority.

Bayside relies on *Pozar* v. *Department of Transportation* (1983) 145 Cal.App.3d 269 [193 Cal.Rptr. 202] (*Pozar*), in which the Court of Appeal issued mandate to compel Caltrans to follow its own regulations providing that "the item price shall prevail" in the event of a discrepancy between specified per-item price and total unit costs in a contractor's bid. The court characterized the regulation as imposing a "ministerial duty" under the circumstances. (145 Cal.App.3d at p. 271.) *Pozar* does not help Bayside. The case used the mandatory-permissive distinction for characterizing duty, not the mandatory-directory distinction for determining validity. Indeed, there was nothing to invalidate in *Pozar*. The court had issued a stay of the contract award pending consideration of the merits. (*Ibid.*)

Accordingly, prior noncompliance with the code or Handbook regulations could not have rendered the current hold invalid, and the trial court correctly confined its attention to whether the current hold was *otherwise* validly placed.

### Strict versus substantial compliance

Bayside's claim that strict rather than substantial compliance with the Handbook's hold procedures was needed seems to be a variant of its claim, just rejected, that noncompliance is invalidating. To the extent that Bayside urges that certain procedures had to be strictly followed, the claim is subsumed in the substantial compliance discussion which follows.

### Substantial compliance

■ Substantial compliance means actual compliance in respect to the substance essential to every reasonable objective of the statute (*Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 649 [180 Cal.Rptr. 297, 639 P.2d 939]; *Myers* v. *Patterson, supra*, 196 Cal.App.3d 130, 138) or, in this case, the

regulation. ■ At issue here is Handbook section 1002.006, which sets out the application procedure for hold category 2B-land held for a project other than the one for which it was acquired. Subpart F(1) states in pertinent part: "Each application must contain the STIP [State Transportation Improvement Program] number and approval date or the Project Authorization Report (PAR) approval date, if available. In addition, each application must specifically identify the planned use for property and the date by which the parcel will be transferred to the project. A parcel map must be attached to each application."

Caltrans's last 2B hold was applied for and approved in 1991, before the petition here was filed. The court found that it substantially complied with the Handbook. We agree and reject Bayside's contrary arguments.

The hold identifies by Caltrans parcel number the property (34258) and two adjoining ones, specifies a release date of July 31, 1994, and states in pertinent part: "These parcels are required for the Islais Creek Interchange Project, which is endorsed by the City and County of San Francisco and is in the 1990 STIP for FY 93/94 (No. 610A), Design EA 395750." It bears approval signatures from June 1991 by three officials of the Division of Right of Way (division) and in December 1991 by the division chief in Sacramento where it was evidently sent for final approval.

As no PAR approval date is given, one issue is whether the alternative requirement of a "STIP number and approval date" was met. Bayside urges that the hold's reference to "the 1990 STIP for FY 93/94 (No. 610A)" was deficient for giving only the fiscal year rather than a *specific* STIP approval date. It notes that Judge Pollak gave Caltrans a chance to submit post-hearing declarations, showing that the agency practice was to give only the fiscal year, and that Caltrans declined to furnish proof of that agency practice.

However, Bayside fails to explain why a specific approval date was, in substantial compliance terms, *essential* to some reasonable objective (*Assembly* v. *Deukmejian, supra,* 30 Cal.3d 638, 649) of the regulation. Caltrans represented without dispute below that STIP's are renewed each fiscal year. It appears that the approval date's purpose is to help the agency verify that there has been a STIP renewal for the stated fiscal year. In other words, the objective is not to prove on the face of the application that renewal has occurred but to guide the agency to that conclusion from its own records. A specific approval date is thus a mere convenience (*Myers* v. *Patterson, supra,* 196 Cal.App.3d 130, 138; cf. Handbook, § 1002.007), not an essential part

of the hold. Use of the STIP fiscal year as an approval date was substantial compliance.

Because the STIP number and approval date were adequately given, there was no need for the hold to be approved by the division's director. (Handbook, § 1002.007F(2).)

Bayside contends that the hold failed to substantially comply with the requirement that it "specifically identify the planned use for the property"—not because the project is inadequately described but because the parcel is included with two other parcels in the same hold. The claim is specious. Nothing in the regulations requires a separate hold for each piece of property where, as here, all three are contiguous and held for the same highway project. The hold differentiates the Bayside parcel from the others by parcel number and square footage. No confusion results.

### Project abandonment

It was learned just before the hearing that the city, by a June 10, 1992 letter from its department of public works, had reversed its 16-year position and now asked that the state abandon the Islais Creek Interchange Project. Bayside contends it was an abuse of discretion, under the new circumstances, not to order Caltrans to offer the property for sale. We disagree.

Mandate may lie to *compel* an exercise of discretion but not to *control* it, i.e., to order its exercise in a particular manner (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610]), unless discretion can be lawfully exercised only one way under the facts (*Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 205 [211 Cal.Rptr. 398, 695 P.2d 695]).

The city's letter compelled neither an immediate termination of the hold status nor, it follows, an immediate offer of sale to Bayside (and certainly not at 1976 fair market value). Caltrans acknowledged by declaration below that the letter would "apparently trigger independent reviews by state and federal officials of the project and potential alternative uses for the property." That review, however, would require the agency to evaluate *all* relevant circumstances, only some of which might be in the present record. Bayside's point that the present record shows *only* the city's interest in the project as justifying the hold overlooks the fact that Caltrans would make its determination not on this record, but on one which might include considerations never raised on prior hold applications. The property was currently in a valid

hold status, and no duty could arise to offer it for sale until Caltrans "determined and certified" that it was no longer required for rights of way or other operational purposes. (Handbook, § 1001.000 [defining excess lands].) Even under Bayside's view of the regulations as creating a default excess-lands status for property along rescinded routes (on which we express no view), no sale duty begins to arise until route rescission has occurred. No such action had been taken here; nor had Bayside shown that Caltrans would refuse to exercise its discretion. Mandate did not lie.

II

Bayside also urges that mandate should have issued to force Caltrans to offer it a "hearing" and to open its file for inspection—refusals of which constituted asserted violations of due process and Bayside's opportunity to be heard. We deem the argument waived by failure to cite authority or provide any separate legal analysis in support. (*Utz* v. *Aureguy* (1952) 109 Cal.App.2d 803, 807 [241 P.2d 639].) Moreover, the argument seems tied to the unsuccessful one above, that Caltrans had a duty enforceable by mandate to offer the property for sale. The severed cause of action for mandate at issue here alleged only that Caltrans's violation of "statutory duties and internal procedures" formed a due process violation. There being no duty enforceable by mandate, the due process claim fails as well.

The judgment is affirmed.

Benson, J., and Phelan, J., concurred.

A petition for a rehearing was denied December 29, 1993, and appellant's petition for review by the Supreme Court was denied March 24, 1994.